UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————X

NASSER SABER,                                          **JURY TRIAL DEMANDED**

                          Plaintiff,                   **COMPLAINT**

          - against -

NEW YORK STATE DEPARTMENT                              ECF Case
OF FINANCIAL SERVICES,

                          Respondent.
--------------------------------------------------------------------------X

          Plaintiff, NASSER SABER, by his attorneys TRAUB & TRAUB, P.C., complaining of

defendant, alleges as follows:

<u>NATURE OF THE ACTION</u>

          1.          This is an action arising under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. Section 2000e *et seq.,* the Civil Rights Act of 1871, 42 U.S.C. Sections 1981

and 1983, and the New York State Executive Law, Section 290 *et seq.,* seeking to redress

employment discrimination against Plaintiff in his employment by Defendant on the basis of his

Iranian national origin, his Persian and Middle Eastern race and ancestry, and his Muslim

religion, as well as retaliation taken against Plaintiff after voicing complaints about said

discrimination to Defendant.

          2.          This action is also brought to redress a long-term pattern and practice on the part

of Defendant to discriminate against Plaintiff based on his race and to retaliate against Plaintiff

for his complaints about race discrimination, the details of which are included to show that the

actions for which plaintiff seeks redress were part of a custom and policy of race discrimination

and retaliation.

<u>JURISDICTION AND VENUE</u>

3.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1331 and 1343(a)(4) and 2201, 29 U.S.C. Section 21(b), and 42 U.S.C. Section 2000e-5(f)(3). Plaintiff respectfully requests that this Court exercise pendant jurisdiction over his claims arising under the State law.

4.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. Section 1391(e) and 42 U.S.C. Section 2000e-5(f)(3), on the bases that it is the judicial district in the State in which the unlawful employment practice is alleged to have been committed; it is the judicial district in which the employment records relevant to such practice are maintained and administered; and a substantial part of the events or omissions giving rise to Plaintiff's claim occurred therein.

<u>PARTIES</u>

5.      Plaintiff is a citizen of the United States and he resides in the City and State of New York.

6.      Upon information and belief, defendant NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES (hereinafter "DFS") is an agency of the State of New York, charged with the mission of overseeing and regulating a broad array of financial institutions, products and services including, but not limited to, banking and insurance and their capital markets activities.

7.      Upon information and belief, defendant DFS was created on or about October 3, 2011 as a result of the passage of the Financial Services Law, pursuant to which the New York State Banking Department and the New York State Insurance

Department were abolished and the functions and authority of those agencies were transferred to the newly created New York State Department of Financial Services.

8.      Upon information and belief, defendant DFS employs more than 500 employees and is therefore an employer within the meaning of Title VII, 42 U.S.C. Section 2000e-(b), and Section 292(5) of the New York State Executive Law.

9.      Defendant DFS maintains its offices at 1 State Street, New York, NY 10004.

<u>ADMINISTRATIVE AND PROCEDURAL HISTORY</u>

10.     Plaintiff filed a Charge of employment discrimination against Defendant on or about November 27, 2013, by hand-delivery to the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC").

11.     On or about June 3, 2014, Plaintiff supplemented and amended his Charge pending before the EEOC.

12.     On or about October 29, 2014, Plaintiff further supplemented and amended his Charge pending before the EEOC.

13.     On or about May 13, 2015, Plaintiff received a Notice of Right to Sue from the U.S. Department of Justice, Civil Rights Division.

14.     This Complaint is being filed within ninety (90) days of receipt of said Notice of Right to Sue.

<u>FACTUAL ALLEGATIONS</u>

15.     Plaintiff was born in Urmieh, Iran and is an individual of Iranian origin and Persian and Middle Eastern race and ancestry.

16.     Plaintiff is Muslim.

17.     Plaintiff came to the United States in June of 1977, after receiving his

Bachelors of Science Degree from Tabriz University in Iran.   In 1980, Plaintiff

received a Masters in Science Degree in Civil Engineering from Case Western

University.  In 1983, Plaintiff received a Masters in Business Administration in

Quantitative Analysis and Finance from New York University Graduate Business

School.

18.     Plaintiff became a United States citizen in or about 1995.

19.     After completing his education, Plaintiff worked in the private sector

in banking, business and risk management from in or about 1983 to in or about

2001.

20.     From in or about 1993 to 2003, Plaintiff taught in New York

University's School of Professional and Continuing Studies.  Plaintiff created a Risk

Management Program, taught courses on derivatives and risk management, and

conducted seminars and workshops for visiting bankers and financial officers from

foreign countries.  Plaintiff was the recipient of a Best Teacher award.

21.     In 1993, Business One Irwin published Plaintiff's best-selling book

"Valuation, Trading, and Processing Interest Rate Swaps".

22.     In 1999, the Financial Times published two volumes of a book Plaintiff

authored entitled *Speculative Capital*, and selected the first volume for recognition

as the Book of the Month.  A third volume of *Speculative Capital* was published in

2006 and a fourth volume is due out shortly.

23.     In August of 2001, Plaintiff was offered and accepted a position with

Defendant agency and began work with what was then the New York State Banking

Department as a Senior Capital Markets Risk Specialist, Grade 25, on or about

September 4, 2001 – just days before the terrorist attack of 9/11.

24.     Upon information and belief, Plaintiff's national origin and his Persian

and Middle Eastern race and ancestry and his religious affiliation are and were

widely known by the individuals with whom he works at Defendant DFS including,

but not limited to, those individuals identified in this Complaint.

25.     As a Senior Capital Markets Risk Specialist, Plaintiff's job duties and

responsibilities included, but was not limited to, reviewing and monitoring the

capital markets activities of financial institutions licensed to do business in the State

of New York.

26.     Plaintiff's work as a Senior Capital Markets Risk Specialist was

performed at a high level of competence and he was given high-level responsibilities

including, by way of example only, writing speeches and preparing talking points

and proposals for the Superintendent of Banking and for the Chief Risk Management

Specialist on executive level matters.   Plaintiff was asked to – and did – provide

training and seminars at the Defendant agency and for the Defendant agency's

Capital Markets staff on subject matters ranging from quantitative finance, fair value

accounting, money and banking, security analysis, option valuation and more.

Plaintiff was asked to – and did – perform examinations at some of the largest

financial institutions in New York and abroad and performed his work at a superior

level.

27.     Despite Plaintiff performing high-level work, Plaintiff's supervisors –

high ranking agency officials – treated Plaintiff with suspicion, scrutinized his

behavior without any legitimate reason, and made negative comments about Iran, Iranians and individuals with Iranian and Middle Eastern ancestry including, but not limited to the Plaintiff.

28.     By way of example, in or about 2003, Antonio Marfia, the then Chief Risk Management Specialist for Capital Markets, asked Plaintiff to volunteer to fly to England on a work-related matter when other employees had declined the assignment due to concerns of flying post 9/11, stating in sum and substance that, as an Iranian, Plaintiff should not be afraid of the plane being hijacked.

29.     By way of further example, in or about 2005, Antonio Marfia, still the Chief Risk Management Specialist for Capital Markets, assigned Plaintiff to work at the Bank of New York and, having forgotten that Plaintiff was from Iran, and mistakenly assuming he was from Egypt, directed Plaintiff to "go take care of that crazy woman", referring to another Defendant agency employee, Manzar Sahebjam-Atabaki who, upon information and belief, is also of Iranian and Muslim heritage and who was serving as the Central Point of Contact with that financial institution.  Mr. Marfia further remarked to Plaintiff:  "one Egyptian can handle ten Iranians".

30.     By way of further example, in or about 2005/2006, Chief Risk Specialist Antonio Marfia demanded Plaintiff surrender his work computer to him and referred Plaintiff for investigation by the New York State Banking Department's Criminal Investigation Bureau without any legitimate basis for doing so.  At the conclusion of the unwarranted investigation, Mr. Marfia warned Plaintiff that "this time", they did not find anything "illicit", but warned Plaintiff that "we are watching you."

31.     Despite Plaintiff continuing to perform high-level work, and despite a strong recommendation from his immediate supervisor that he be promoted, Plaintiff was not promoted until 2007 to Principal Risk Specialist, Grade 29, and only after he filed a grievance complaining of unequal treatment, as those with lesser qualifications had been and were repeatedly being promoted in his stead.

32.     In late 2007, Plaintiff requested permission to begin a personal blog on the Internet.  David Fredsall, Deputy Superintendent for Foreign and Wholesale Banking, approved and encouraged Plaintiff's request and Plaintiff began writing the blog dialeacticsoffinance.blogspot.com.  Plaintiff's blog writings were about finance generally; Plaintiff never touched on subject matters related to his job or to the Defendant agency.

33.     On or about February 5, 2008, David Logan, then a Supervising Bank Examiner for Defendant agency sent to Plaintiff and others an email entitled "For Your Reading Enjoyment" regarding Iran's support for terrorism and the cutting off of a Bank from the U.S. financial system

34.     On or about November 7, 2008, David Logan, then the Assistant to the Central Point of Contact at the Bank of New York, the financial institution where Plaintiff was assigned to work, confiscated Plaintiff's work computer and a number of Plaintiff's personal belongings.  A week later, it was demanded that Plaintiff surrender his Bank of New York identification card so Plaintiff could not gain entry.  For a second time, Plaintiff was referred to the Defendant agency's Criminal Investigation Bureau for alleged illicit activity, without there being any legitimate basis for doing so.

35.     The investigation revealed no wrongdoing by Plaintiff and, although his work computer was returned to him, all of his personal belongings were retained by the Defendant agency without any basis for doing so.

36.     In or about December 2008, not long after the second baseless referral of Plaintiff to the Defendant agency's Criminal Investigation Bureau, Plaintiff was sent to work at a financial institution located in Stamford, Connecticut, where there was no capital markets work to perform and where Plaintiff was assigned little, if any, work.  Assignment to this institution also required an additional two hours of commuting time and unreimbursed commuting expenses in excess of $20,000.00.   Upon information and belief, Plaintiff was the only Risk Specialist assigned to work in Stamford who suffered an increase in commuting time and expense.  Nonetheless, Plaintiff performed what little work Plaintiff was assigned at a superior level.

37.     When Plaintiff was finally reassigned back to New York in the Spring of 2010, Plaintiff was assigned work at only small branches of foreign banks located in New York.  Plaintiff was no longer assigned work at the larger financial institutions to which Plaintiff had been assigned earlier in his career with the New York State Banking Department.

38.     In October of 2011, the New York State Banking Department officially merged with the New York State Insurance Department, forming the Defendant entity – the New York State Department of Financial Services ("DFS").

39.     After the formation of the Defendant agency, the New York State Department of Financial Services, significant agency resources were devoted to taking action against financial institutions that were perceived as having previously violated sanctions against Iran.  Upon information and belief, this chosen focus contributed to fostering an anti-Iranian and anti-Muslim atmosphere at Defendant agency.

40.     This antipathy towards those of Iranian national origin, Persian or Middle Eastern race and ancestry and/or Muslim religious heritage manifested itself in further statements by high-level Defendant DFS employees to or in the presence of Plaintiff, as well as in actions taken by the Defendant agency employee to marginalize and isolate Plaintiff and his Iranian, Muslim co-worker at the workplace; to diminish Plaintiff's work and value and the work and value of Plaintiff's Iranian/Muslim co-worker to the Defendant agency; and to foreclose Plaintiff and his Iranian/Muslim co-worker from advancement.

41.     On or about November 22, 2011, Plaintiff was called into a meeting with David Logan, who was then the Assistant Deputy Superintendent, and Division Head Matti Peltonen.

42.     Upon information and belief, Mr. Logan is Caucasian, non-Muslim, U.S.-born and of non-Persian and non-Middle Eastern national origin and ancestry.

43.     Upon further information and belief, Mr. Peltonen is Caucasian, non-Muslim and of Finnish national origin.

44.     Mr. Logan and Mr. Peltonen advised Plaintiff that, effective immediately, Plaintiff would be assigned to the newly merged Insurance side of Capital Markets, which had the effect of isolating him away from Banking and the capital markets activities of banking institutions – an area in which he possessed great expertise and in which he had proven his value as an agency employee – and limited him to working in the Defendant's office rather than on-site at financial institutions.

45.     Upon information and belief, Plaintiff was the only Capital Market Risk Specialist from the Banking Department who was reassigned.  All of the Risk Specialists from what had been the New York State Banking Department conducted and continued to conduct on-site examinations of banks after the merger and creation of Defendant agency with the sole exception of the Plaintiff.

46.     Upon information and belief, all of the Risk Specialists from what had been the New York State Insurance Department conducted and continued to primarily conduct desk audits of data provided by insurance companies after the merger and creation of Defendant DFS.

47.     Upon information and belief, Plaintiff was the only Risk Specialist who was reassigned and, upon further information and belief, Plaintiff was the only Risk Specialist who was and is Muslim and the only Risk Specialist who was and is of Iranian, Persian or Middle Eastern national origin, race and ancestry.

48.     Despite being transferred to the Insurance side of the Defendant agency, Plaintiff was not provided with the equipment provided to all other Risk Specialists on the Insurance side, including being given no desktop computer on

which to work, despite all other Risk Specialists on the Insurance side being provided with such.

49.     Mr. Logan and Mr. Peltonen also advised Plaintiff in the meeting of November 22, 2011 that he better stop writing Plaintiff's blog, despite Plaintiff having previously gotten permission to do so, stating to Plaintiff that he was "especially vulnerable" because he had "no rabbi".

50.     In the summer of 2012, when the Defendant agency was in need of his expertise, Plaintiff was assigned to a complex New York State Teachers' Retirement System (hereinafter "TRS") pension fund review.  Plaintiff assumed primary responsibility for, among other things, writing the agenda, questions, and analysis of the investment and capital markets activities of the TRS.  Plaintiff conducted interviews, including interviews with members of the board, and chaired over twenty meetings.  Nonetheless, Plaintiff was excluded from the critical closeout meeting on that review, upon information and belief, by decision of Division Head Matti Peltonen, in an effort to deny Plaintiff credit and recognition for the work he performed in that assignment.

51.     Thereafter, for large periods of time, Plaintiff was given virtually no meaningful work or assignments and he was marginalized by the lack of assignment of meaningful work.

52.     In 2012, the position of Chief Risk Specialist for the Banking side of the Defendant agency became vacant.  The position was announced and Plaintiff applied for the position.   Plaintiff was interviewed in the Spring of 2012 by David Logan, the Assistant Deputy Superintendent; Matti Peltonen, the Division Head over

both the Banking and Insurance sides for Capital Markets; and Eric Maddoff, the

Chief of Staff, and Mary O'Brien, the Human Resources Director.  No selection was

made, despite Plaintiff's superior qualifications for the position.

53.    The Chief Risk Specialist position on the Banking side was re-

announced in the Fall of 2012.  Plaintiff applied again for the position, but no

selection was made until in or about May of 2013, when John Cappello who, upon

information and belief, is U.S.-born, non-Muslim, and of non-Iranian, non-Persian

and non-Middle Eastern origin, race and ancestry, appeared on the job in the

position.

54.    Plaintiff's qualifications for the position of Chief Risk Specialist on the

Banking side were plainly superior to those of Mr. Cappello.   By way of example,

only, Plaintiff holds an undergraduate degree in engineering, and two advanced

degrees – a Masters in Engineering and an MBA in Quantitative Analysis and

Finance; planned and conducted examinations of the capital market operations of

regulated institutions and performed in-depth analysis of trading activities and risk

profiles of large, complex financial institutions from December 2001 up until his

interview date; is a well-published and well-reviewed author in the area of Finance;

has taught finance at New York University, and had sixteen years working in finance

in the private sector followed by twelve years of working in finance with the

Defendant DFS and its predecessor agency.  In contrast, Mr. Cappello holds an

undergraduate degree in a non-finance related area (philosophy); holds no

advanced degrees; had no prior experience at the agency; and had no paid

employment at all for a number of years before his selection by Defendant DFS for this position.

55.     Plaintiff was denied equal and fair consideration for the position of Chief Risk Specialist on the Banking side, and was not selected for said position, despite Plaintiff's qualifications being markedly superior to that of Mr. Cappello.

56.     In January of 2013, the position of Chief Risk Specialist for the Insurance side of the Defendant agency became vacant.  Upon information and belief, the Defendant agency did not announce the open position and, instead, David Logan, Assistant Deputy Superintendent, and Matti Peltonin, Division Head, selected Anna Taam non-competitively for the position.

57.     Upon information and belief, Ms. Taam is U.S.-born, non-Muslim, and of non-Iranian, non-Persian, and non-Middle Eastern origin, race and ancestry.

58.     Upon further information and belief, Plaintiff's qualifications were superior to those of Ms. Taam.  All of the Plaintiff's education and experience, as set forth in paragraph 54, that made him well qualified for the position of Chief Risk Specialist for the Banking side also made him well qualified for the job on the Insurance side.  In contrast, Ms. Taam had no background in insurance business or regulation; had no previous experience performing examinations nor experience using the quantitative skills required in measuring, monitoring and mitigating the market risks of the institutions the Defendant agency is charged with overseeing; and had no paid employment for several years prior to her selection for the position.

59.     In or about May of 2013, when the Division moved to a new space on the 20th floor of 1 State Street in New York, New York, Plaintiff was assigned to a cubicle space with no window.

60.     All of the windowed cubicle spaces were assigned to Caucasians and one Asian, while the sole African-American Specialist and Plaintiff were assigned non-windowed cubicles in a dark corner of the office together with lower-graded employees, almost all of whom were African-American.

61.     One of the widowed cubicles remained unoccupied, while another windowed cubicle was assigned to a new probationary Caucasian employee who, upon information and belief, is non-Muslim and not of Iranian, Persian or Middle Eastern national origin, race and ancestry.

62.     In or about May or June of 2013, Plaintiff requested promotion to the position of Supervising Risk Specialist, Grade 31, as Plaintiff was performing the same work as all of the other Risk Specialists assigned to the Insurance side of Capital Markets, yet Plaintiff was working at a lower grade with a lesser salary and inferior benefits.

63.     Upon information and belief, not one of the Risk Specialists – all of whom were receiving greater pay – were or are Muslim or were of Iranian, Persian or Middle Eastern national origin, race or ancestry.

64.     On or about June 11, 2013, Plaintiff filed an "out of title grievance" in connection with his performing the same work as the Grade 31 Insurance Risk Specialists.  Six days later, on or about June 16, 2013, Plaintiff was suddenly directed

to "report" to Margot Small, a Grade 31 Risk Specialist to whom only junior level insurance examiners and a trainee reported.

65.     Matti Peltonen, Division Head, denied Plaintiff's request for the upgrade he deserved and, despite filing a grievance in connection with that denial and his unequal treatment, Plaintiff's request was further denied by counsel for the Defendant agency, Scott Gollop, an individual who would himself make a negative comment related to Plaintiff's national origin, race, ancestry and/or religion, as set forth more specifically below in paragraph 92.

66.     Directly after Plaintiff complained about unequal and disparate treatment and discrimination in the grievance that he filed, Defendant agency through its supervisory personnel took action to discredit Plaintiff's work performance – something that had never occurred previously in his more than twelve years of employment with Defendant agency.

67.     On or about July 30, 2013, not long after Plaintiff complained about not being treated in a fair and equal manner with the other Risk Specialists performing the same work on the Insurance side of Capital Markets, Plaintiff was called into a "counseling" session with Matti Peltonen, Markets Division Chief, and Anna Taam, the new Chief Risk Specialist for Insurance.

68.     Thereafter, on or about August 12, 2013, Ms. Taam issued a written "Counseling Memorandum" to Plaintiff and had the Memorandum placed into Plaintiff's Personnel History File.

69.     Upon information and belief, the decision to "counsel" Plaintiff after his complaining of unfair and unequal treatment and to issue Plaintiff a "Counseling

Memorandum" was made jointly by the following employees of the Defendant

agency:  Chief Risk Specialist Anna Taam, Division Head Matti Peltonin and counsel

for Defendant DFS Scott Gollop.

70.     In August, 2013, Plaintiff was also transferred from the Insurance side

where he had been performing the same work as the Grade 31 Specialists for less

pay and lesser benefits back to the Banking side to now "assist" the new Chief Risk

Specialist, John Cappello, without any change to his grade and salary.

71.     Plaintiff was advised at this time that he would be functioning as a

"Desk Examiner" – a non-existent title on the Banking side of Capital Markets, as the

role of Capital Risk Specialists on the Banking side is to go out to Banks and other

financial institutions for purposes of examining them on-site, not from a desk at the

Defendant agency.  Plaintiff was the only Capital Risk Specialist required to perform

his work at a desk within the Defendant agency's offices, rather than on-site at

financial institutions.

72.     On October 30, 2013, without prior discussion or notice, Plaintiff was

instructed to move to another cubicle, this one in an area used on a temporary basis

by examiners between assignments.  This cubicle is extremely basic, smaller than

Plaintiff's last cubicle, and located at a particularly noisy and highly trafficked

intersection, and had no telephone and no desktop computer.  Plaintiff was the only

Capital Risk Specialist exiled to work in a cubicle located with those who do

transient work at Defendant agency.

73.     On November 12, 2013, Plaintiff came to the office and found his

assigned cubicle occupied by a job examiner who was between jobs.  Neither Chief

Risk Specialist Cappello, nor Deputy Assistant David Logan, who then served as Co-Division Head of the Market Division, directed the employee to move so Plaintiff could occupy the cubicle assigned to him, despite Plaintiff's request that they do so. When Plaintiff sat in his old, larger and quieter cubicle – which still remained empty as of that date – Mr. Logan loudly and publicly reprimanded Plaintiff in a humiliating fashion.  Although Mr. Logan eventually agreed to allow Plaintiff to use his old cubicle that week, Mr. Logan insisted that Plaintiff return to the new, smaller and more isolated cubicle the following week.

74.     In short, Plaintiff was made to feel exiled in a public and humiliating fashion for no legitimate business purpose.

75.     Plaintiff continued to receive assignments to only smaller institutions and to have his job responsibilities further diminished.

76.     By way of example, on or about November 6, 2013, Plaintiff was assigned to a mortgage banking outlet in Flushing, Queens, an institution with no meaningful capital markets activity to review.

77.     On or about November 27, 2013, Plaintiff filed a Charge of Discrimination with the EEOC complaining about Defendant's discriminatory and retaliatory conduct.

78.     After the filing of Plaintiff's Charge of Discrimination, further discriminatory and retaliatory conduct resulted including, but not limited to, progressively escalating negative assessments of Plaintiff's work performance, further diminishment of Plaintiff's work responsibilities; and, issuance of unwarranted formal charges and discipline against Plaintiff.

79.     On or about January 2, 2014, approximately five weeks after Plaintiff filed his EEOC Charge of Discrimination, Plaintiff was assigned to work at Emigrant Bank, a private community bank with barely any capital markets activity for a Capital Markets Risk Specialist like Plaintiff to review.

80.     These assignments to smaller financial institutions were in stark contrast to Plaintiff's earlier assignments at the Defendant agency, which included significant and complex work at large, sophisticated institutions, such as Deutsche Bank, BNPP, JP Morgan and Bank of New York.

81.     On or about January 10, 2014, approximately six weeks after Plaintiff filed of his EEOC Charge of Discrimination, Chief Risk Specialist John Cappello, together with Assistant Deputy David Logan – individuals who had been identified in Plaintiff's EEOC Charge - gave Plaintiff a negative annual performance evaluation with unwarranted criticism of Plaintiff's work performance.  This was the first time that Plaintiff had ever received a negative performance appraisal in his more than twelve years with the Defendant agency.

82.     A few days later, on or about January 14, 2014, Plaintiff was given an Interim Evaluation Review ("IER"), also known as a job evaluation, which contained unwarranted negative and critical narrative comments.  This was the first time Plaintiff had ever received an IER that included any kind of negative or critical comments.  Moreover, the IER was issued by a Mortgage Area Manager, Helen Hodge, who was not on-site on the job, an individual with whom Plaintiff had never worked, and who had no personal knowledge of Plaintiff's work performance.

83.     When Plaintiff made inquiry of Ms. Hodge, she stated to him that she had been asked to issue the negative IER by Plaintiff's supervisors and Ms. Hodge made express reference to Plaintiff's "Deputy" - David Logan.

84.     On May 9, 2014, Plaintiff received an unsatisfactory semi-annual or six month job recertification performance evaluation, issued to him by Chief Risk Specialist John Cappello, together with Assistant Deputy Superintendent David Logan – two individuals identified in Plaintiff's Charge of Discrimination.

85.     This was the first time that Plaintiff had ever received an unsatisfactory semi-annual or recertification evaluation during his entire career with Defendant DFS or its predecessor agency.

86.     The unsatisfactory evaluation provided absolutely no details, explanations or allegations with respect to Plaintiff's work other than to rate Plaintiff's performance as "unsatisfactory".

87.     Issuance of the unsatisfactory evaluation was wholly unwarranted.

88.     Upon information and belief, no other employee of the Defendant agency under the supervision of either Mr. Cappello or Mr. Logan was issued an unsatisfactory evaluation, semi-annual or annual.

89.     On or about May 29, 2014, Assistant Deputy Superintendent David Logan, one of the individuals identified in Plaintiff's EEOC Charge as one of the discriminating and retaliating officials from Defendant agency, made a statement to Plaintiff and a number of fellow employees referencing Iran and Iran's nuclear capabilities, saying that the reason the staff had been mandated to take an online

course on hazardous materials in the workplace was that Plaintiff was "hiding yellowcake" in his cubicle.

90.     As a result of the foregoing, on or about June 5, 2014, Plaintiff filed an Amended Charge of Discrimination with the United States Equal Employment Opportunity Commission.

91.     The filing of Plaintiff's Amended Charge resulted in yet more discrimination and increased retaliation, as well as further comments referencing Plaintiff's national origin, ancestry and/or religion, as set forth below.

92.     On August 7, 2014, Plaintiff was called into a "pre-disciplinary interrogation" by Scott Gollop, an in-house agency attorney, during which time Plaintiff was questioned about his performance at the agency.  Mr. Gollop would later ask Plaintiff if it was not true that he "didn't waterboard" Plaintiff during the course of that interrogation, making reference in so doing to Islamist terrorists.

93.     On or about October 3, 2014, at a time when Plaintiff's annual work performance had been rated as fully successful for the year just prior, notwithstanding the mid-year review, John Cappello, in consultation with other Defendant agency employees, including Marie Filipakis, Executive Deputy Superintendent of the Markets Division, Cheryl Aini, Director of Administration, Scott Gollop, in-house counsel for the Defendant agency, and Marie Campbell from the Defendant's Human Resources Department, issued Plaintiff formal Charges alleging "misconduct" and "incompetence" and a Notice of Discipline in the form of a 20-day unpaid suspension.

94.     This was the first time in Plaintiff's career at Defendant agency that he had ever been issued discipline in any form and it was wholly unwarranted.

95.     As a result of the foregoing, Plaintiff filed a further Amendment to his EEOC Charge of Discrimination on or about October 29, 2014.

96.     The discriminatory and retaliatory conduct has nonetheless not abated and continues.

97.     By way of example only, on or about April 8, 2015, the day after Chief Risk Specialist John Cappello - an individual named in Plaintiff's EEOC Charge of Discrimination - testified at an arbitration hearing challenging the unwarranted Charges and discipline issued to Plaintiff, Mr. Cappello assigned Plaintiff to a review of personnel management practices at a financial institution in New Jersey, a review covering the personnel needs, recruiting and retention practices, training and development, and performance reviews of a financial institution – an assignment that included absolutely no capital markets work at all and which resulted in a continued diminishment of Plaintiff's work responsibilities.

98.     So, too, the Defendant agency continues to isolate Plaintiff and downplay his skills and potential contributions.  By way of example only, Chief Risk Management Specialist Cappello announced that Defendant agency would purchase books in the area of Finance for its library, but neither considered nor purchased any of the books authored by Plaintiff, despite such books being relevant to the work of the Capital Markets Team at Defendant agency and despite Plaintiff having authored books that were well reviewed and/or found worthy of translation.

99.     Defendant DFS has also continued its efforts to bar Plaintiff from moving into higher-level positions.  By way of example only, Chief Risk Management Specialist John Cappello announced at a staff meeting on or about June 3, 2015 that when the agency is in a position to do so they will seek to hire a higher-graded Model Risk Specialist – i.e., someone with a background in mathematical models used in pricing portfolios - a position for which Plaintiff is well qualified.  When Plaintiff reached out to Mr. Cappello and expressed his interest in applying for the position, Mr. Cappello reversed course and stated, in direct contradiction to his statements at the staff meeting, that there was no plan to fill such a position.

100.    The antipathy of the Defendant agency to employees of Iranian, Persian and/or Middle Eastern national origin, race and ancestry and to those of the Muslim religion during the relevant time period has been displayed not just toward Plaintiff.

101.    Upon information and belief, Manzar Sabehjam-Atabaki, an employee of the Defendant DFS, has faced a similar diminution of responsibilities and efforts to isolate her by the agency.  By way of example only, although having risen to the level of a Deputy Superintendent of Banking, during the time period at issue in this Complaint, Ms. Sahebjam-Atabaki was removed from her position and has been assigned to work of far lesser importance and been forced to report to those with titles beneath hers.

102.    Upon further information and belief, Ms. Sabebjam-Atabaki filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission in or about January 2015 and, after doing so, faced further discrimination and

retaliation in the form of escalating criticism of her work performance and issuance

of formal counseling – something she had never experienced prior to her

complaining of discrimination.

FIRST CAUSE OF ACTION
VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
DISCRIMINATION BASED UPON NATIONAL ORIGIN

103.    The allegations contained in paragraphs 1 – 102 are incorporated by

reference as though fully set forth herein.

104.    Defendant DFS' acts, practices and policies described herein

constitute intentional discrimination against Plaintiff on the basis of his national

origin in violation of 42 U.S.C. Section 2000e *et seq.*

105.    As a direct and proximate consequent of Defendant's unlawful conduct as

described above, Plaintiff has suffered a loss of income, pension benefits, and other forms

of compensation, including but not limited to, past and future salary increases and other

emoluments of employment.

106.    Plaintiff has further suffered emotional distress and suffering, mental

anguish, and other non-pecuniary losses as a direct and proximate consequence of

Defendant's unlawful conduct as described above.

SECOND CAUSE OF ACTION
VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
DISCRIMINATION BASED UPON RELIGION

107.    The allegations contained in paragraphs 1 – 106 are incorporated by

reference as though fully set forth herein.

108.    Defendant DFS' acts, practice and policies described herein constitute intentional discrimination against Plaintiff on the basis of his religion in violation of 42 U.S.C. Section 2000e *et seq.*

### THIRD CAUSE OF ACTION
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### RETALIATION

109.    The allegations contained in paragraphs 1 – 108 are incorporated by reference as though fully set forth herein.

110.    Defendant DFS' acts, practices and policies described herein constitute retaliation against plaintiff for his complaints of discrimination in violation of 42 U.S.C. Section 2000e *et seq.*

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1871
### 42 U.S.C. SECTIONS 1981 & 1983
### BASED ON RACE & ANCESTRY

111.    The allegations contained in paragraphs 1 – 110 are incorporated by reference as though fully set forth herein.

112.    Defendant DFS' acts, practices and policies described herein constitute intentional discrimination against Plaintiff on the basis of his race and his Persian and Middle Eastern ancestry, in violation of the Civil Rights Act of 1871, 42 U.S.C. Sections 1981 and 1983.

### FIFTH CAUSE OF ACTION
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1871
### 42 U.S.C. SECTIONS 1981 & 1983
### BASED ON RETALIATION

113.    The allegations contained in paragraphs 1 – 112 are incorporated by reference as though fully set forth herein.

114.    Defendant DFS' acts practices and policies described herein constitute retaliation against Plaintiff for his complaints of discrimination based on race and ancestry, in violation of the Civil Rights Act of 1871, 42 U.S.C. Sections 1981 and 1983.

SIXTH CAUSE OF ACTION
VIOLATON OF THE NEW YORK STATE EXECUTIVE LAW SECTION 296
DISCRIMINATION BASED UPON NATIONAL ORIGIN

115.    The allegations contained in paragraphs 1 – 114 are incorporated by reference as though fully set forth herein.

116.    Defendant DFS' acts, practices and policies described herein constitute intentional discrimination against Plaintiff on the basis of his national origin in violation of the New York State Executive Law Section 296.

SEVENTH CAUSE OF ACTION
VIOLATON OF THE NEW YORK STATE EXECUTIVE LAW SECTION 296
DISCRIMINATION BASED UPON RELIGION

117.    The allegations contained in paragraphs 1 – 116 are incorporated by reference as though fully set forth herein.

118.    Defendant DFS' acts, practices and policies described herein constitute intentional discrimination against Plaintiff on the basis of his religion in violation of the New York State Executive Law Section 296.

EIGHTH CAUSE OF ACTION
VIOLATON OF THE NEW YORK STATE EXECUTIVE LAW SECTION 296
RETALIATION

119.    The allegations contained in paragraphs 1 – 118 are incorporated by reference as though fully set forth herein.

120.    Defendant DFS' acts, practices and policies described herein constitute retaliation against plaintiff for his complaints of discrimination in violation of the New York State Executive Law Section 296.

<u>DEMAND FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare, adjudge and decree that Defendant DFS discriminated against Plaintiff on the basis of his national origin, in violation of 42 U.S.C. Section 2000e *et seq.*;

B.    Declare, adjudge and decree that Defendant DFS discriminated against Plaintiff on the basis of his religion, in violation of 42 U.S.C. Section 2000e *et seq.*;

C.    Declare, adjudge and decree that Defendant DFS retaliated against Plaintiff in violation of 42 U.S.C. Section 2000e *et seq.;*

D.    Declare, adjudge and decree that Defendant DFS discriminated against Plaintiff on the basis of his race and ancestry, in violation of the Civil Rights Act of 1871, 42 U.S.C. Sections 1981 and 1983.

E.    Declare, adjudge and decree that Defendant DFS retaliated against Plaintiff in violation of the Civil Rights Act of 1871, 42 U.S.C. Sections 1981 and 1983.

F.    Declare, adjudge and decree that Defendant DFS discriminated against Plaintiff on the basis of his national origin, in violation of the New York State Executive Law Section 296.

G.    Declare, adjudge and decree that Defendant DFS discriminated against Plaintiff on the basis of his religion, in violation of the New York State Executive Law Section 296.

H.    Declare, adjudge and decree that Defendant DFS retaliated against Plaintiff, in violation of the New York State Executive Law Section 296.

I.    Order Defendant DFS to retroactively instate Plaintiff to the position of Chief Risk Specialist.

J.    Order Defendant DFS to pay Plaintiff damages in the amount equal to the value of all back pay, including benefits and other emoluments of employment, plus interest thereon, that Plaintiff lost as a result of defendant DFS' discriminatory and retaliatory actions.

K.    Enjoin Defendant DFS from engaging in further discriminatory and retaliatory actions against Plaintiff.

L.    Award Plaintiff compensatory damages.

M.    Award Plaintiff all costs and reasonable attorney's fees.

N.    Order such other and further relief as this Court may deem just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury in this action.

Dated:  New York, New York
       July 29, 2015


TRAUB & TRAUB, P.C.
Attorneys for Plaintiff

By:    */S/ DORIS G. TRAUB*

Doris G. Traub (DT 3114)
39 Broadway, Suite 2420
New York, NY 10006
(212) 732-0208