UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/10/2017
```

------------------------------------------------------------ X
                          :
NASSER SABER,                     :
                   Plaintiff,  :
                         :          15 Civ. 5944 (LGS)
        -against-          :
                         :      **OPINION AND ORDER**
NEW YORK STATE DEPARTMENT OF  :
FINANCIAL SERVICES,        :
                 Defendant. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff Nasser Saber sues his employer Defendant New York State Department of

Financial Services ("DFS"), alleging it discriminated against him on the basis of his national

origin and religion and retaliated against him in violation of Title VII of the Civil Rights Act of

1964 ("Title VII").  DFS moves for summary judgment.  For the reasons stated below, all three

causes of action survive -- discrimination based on national origin, discrimination based on

religion and retaliation -- but are limited as follows.

## I.    BACKGROUND

      The following facts are taken from the parties' statements pursuant to Federal Rule of

Civil Procedure 56.1 and the parties' submissions on this motion.  For the purposes of this

summary judgment motion, all factual disputes are resolved, and all reasonable inferences are

drawn, in favor of the non-moving party, Saber.  *See Young v. United Parcel Serv., Inc.*, 135 S.

Ct. 1338, 1347 (2015).

      Saber is of Iranian national origin and Muslim.  DFS is a New York State agency that

regulates financial services institutions.  In 2001, Saber began working for a predecessor agency

to DFS.  In 2007, he was promoted from Senior Risk Management Specialist to Principal Risk

Management Specialist.  A Risk Management Specialist "perform[s] research and targeted examinations of capital markets activities at regulated institutions."  In 2012, Saber was assigned to DFS's Capital Markets Division ("CMD"), where he currently works.

### A. The Chief Risk Management Specialist Position

Around March 2012, DFS announced an opening for the position of Chief Risk Management Specialist ("CRMS").  The job duties include, among other things, overseeing other Risk Management Specialists.  Saber applied for the position.  DFS interviewed Saber and three others.  According to DFS's former Director of Human Resources, an applicant would be interviewed only if HR and the relevant agency division determined that the applicant was qualified.

The parties dispute what occurred during Saber's interview.  A document dated July 2012 provides a comparative review of the four candidates interviewed.  With regard to Saber, it states:

> Saber did not provide responses that were of the level necessary for this position. His responses to several questions, most notably Solvency II and Basel 2.5 questions and about weaknesses in the SVAR of Basel 2.5, exhibited a lack of understanding.  His discussion of his role as operational risk coordinator at BNYM was limited to the IT portion of his work, contrasted with his resume which spoke to extensive securities operations work done.  Mr. Saber noted that the description of the job in the posting was inaccurate as it reflected the duties of a lower level position.  When advised that this work is in fact part of the duties of a team leader and the Chief, he responded "if it needs to be done, he will do it albeit with reluctance."

David Logan, who was co-head of CMD and interviewed Saber, testified that the document was "an accurate reflection" of the interview.  Logan also testified that they "talk[ed] about Basel 2.5" and "the SVAR" and that Saber "didn't seem to have an understanding" of the topics.

Saber attests that the document "seriously misstates what occurred in [his] interview." He testified that his "responses did not reflect a lack of understanding on any topic," explaining

that that the interview covered "topics on which [he had] both written and taught."  He also denies stating that the job description was "wrong" or that he would perform the job "with reluctance."  After the interview, DFS did not inform Saber whether or not he would be offered the position.

Around September 2012, DFS again announced the vacancy for the CRMS position. DFS had previously "re-announced" vacancies for "a variety of reasons."  Not knowing whether he was still being considered for the position, Saber submitted another application but was not interviewed again.  DFS ultimately hired John Cappello, who began his employment in May 2013.  Saber did not learn that he had been denied this CRMS position until August 2013, when Cappello was assigned to be his supervisor.

In January 2013, another CRMS position became vacant.  DFS "never announced or opened to competition" this CRMS position.  Anna Taam was hired for the position.  Saber did not learn that the position had been available or that Taam had been selected until Taam started working for DFS in February 2013.  Taam was Saber's supervisor from February 2013 until August 2013, when Saber was assigned to work under Cappello.

After filing the instant lawsuit in 2015, Saber learned that DFS had hired Olivia Bumgardner for another CRMS position that it had "never announced or opened up to competition."  An evaluation that Logan drafted states that Bumgardner was interviewed in January 2013 for the CRMS position for which Cappello was selected.  Bumgardner, according to the evaluation, had "limited product experience" and gave "weak response[s] to several questions, especially those involving project management."  She was ranked last out of the seven applicants, not including Plaintiff.  Saber attests that Bumgardner had no "experience planning and conducting examination of the capital markets activities of banks and/or insurance

companies, and she had no experience in trading and risk management," and thus she could not meet the "minimum qualifications" for the position as specified in DFS's previous CRMS vacancy announcements.

### B.      Saber's 2013 Cubicle Assignments

In May 2013, CMD relocated its office.  Its new location includes individual offices and "cubicles designed as open-architecture workstations that are attached by low dividing walls." DFS employees who work in the cubicles can see one another and are "all exposed to both natural light from the windows as well as light from overhead electric panels."  The cubicles are arranged in aisles with one of the aisles being adjacent to the perimeter windows "overlooking the New York harbor."  Saber's cubicle was not adjacent to a window and was located by the emergency exit stairs and a bathroom.  He was subsequently assigned to a smaller cubicle "that was completely exposed, providing no privacy . . . and was exceedingly noisy, situated by the printer and fax machine used by everyone on the floor."

### C.      Saber's Out-of-Title Grievance

In around June 2013, Saber met with Taam and the co-head of CMD, Matti Peltonen, to request a promotion to the position of Supervising Risk Management Specialist.  The grade level for a Supervising Risk Management Specialists was 31, while the grade level for Saber's position, Principal Risk Management Specialist, was 29.  Saber was the only "specialist" in his group -- the "Insurance" side of CMD -- who was not designated a grade level 31.  He was also the only specialist who was Muslim and the only specialist who was "of Iranian, Persian or Middle Eastern national origin."

After meeting with Taam and Peltonen, Plaintiff filed an "out of title" work grievance in accordance with his union's collective bargaining agreement with the State of New York.  His

4

grievance states that he had been "assigned to a group where all capital markets specialists are, and were hired as, grade 31" and he "perform[ed] similar duties to them at a minimum."  Saber requested that his grade level be changed to 31.  In the initial grievance, Saber did not mention the national origin, ethnicity or religion of either himself or any of his co-workers and did not use the word discrimination.

The grievance was sent to DFS's Agency Labor Relations Representative Scott Gollop. Carol DeLuca from DFS's HR Department performed a desk audit of the grievance, which she gave to Gollop.  A desk grievance involves examining the particular tasks that an employee performs as part of his or her job and the amount time spent on each task.  Saber attests that neither DeLuca nor Gollop compared the job duties performed by Saber with those performed by the Grade 31 Supervising Risk Management Specialists at DFS.

In January 2014, Gollop sent Saber a letter informing him that his grievance had been denied.  The letter states that, "although there may be occasions when [Saber] performs duties similar to that of a Supervising Risk Management Specialist, those duties do not comprise a significant percentage of [his] workday."  The letter also notes that, while certain "duties are common to all grade levels within the [Risk Management Specialist] title series, it is the size and complexity of the assigned entities, and supervisory responsibilities that serve as the distinguishing factors when determining appropriate grade level."  The New York State Department of Civil Services Classification Standards states that Supervising Risk Management Specialists conduct examinations "at the largest, most complex institutions, especially large money-centers."  Gollop's letter concludes that the insurance companies and pension funds that Saber had examined were not the "most complex" companies, explaining that, for the pension fund, the company was a domestic entity that offered only one financial product.

**D.** **Saber's Counseling Session and Reassignment**

On July 19, 2013, Saber sent an email regarding "[t]hree proposals for improving the desk audit of monolines."[1]  Saber sent the email to Peltonen, Taam and eight others.  Taam attests that at least one of the other addressees on the email was a "trainee" and that she was "concerned" about the email's content because it "included commentary about work that [Saber] questioned belonged in the domain of CMD responsibilities."

Later that month, Taam and Peltonen held a formal counseling session with Saber to discuss the email.  Taam and Peltonen also discussed an email that Saber had sent to a senior member of a company that DFS regulates.  In that email, Saber wrote, "Be warned that I am terrible on the phone and can barely get a point across, hence the request for a face to face meeting."  Taam told Plaintiff that the statement did not "reflect well on DFS" and "was a disservice to DFS to suggest that staff cannot communicate effectively by phone."  On August 12, 2013, Taam provided Saber with a memorandum summarizing the counseling session.

In August 2013, Saber was assigned to work for John Cappello.  For the next three months, Saber functioned as a "Desk Examiner," which is a "non-existent title on the Banking side" of CMD, and was the "only specialist relegated to remaining in the office rather than conducting examinations on-site at financial institutions."

**E.** **The EEOC Charge and Subsequent Performance Reviews**

On November 27, 2013, Saber filed a Charge of Discrimination ("Charge") against DFS with the U.S. Equal Employment Opportunity Commission ("EEOC").  DFS received notice of the EEOC Charge approximately three weeks later in December 2013.

---

[1] A monoline is an insurance company that sells a single insurance product.

### 1.  The January 2014 Performance Review

On January 10, 2014, Saber received a performance evaluation, which both Cappello and Logan signed.  The evaluation covered the work Saber performed while under Taam's supervision and while under Cappello's supervision.  DFS's evaluation forms provide only two performance ratings from which to choose: "Satisfactory" or "Unsatisfactory."  While Saber received a "Satisfactory" rating, Cappello's comments highlighted concerns regarding his work.  For instance, the evaluation states that "[w]hile [Saber's] performance of th[e] task [of reviewing incoming reports] met minimum standards, his comments were largely superficial, often caustic, and rarely constructive or additive to the product."

The January 2014 evaluation was the first performance appraisal Saber had ever received with negative comments about his work conduct or performance.  The evaluation's timing was "unusual" given that (1) Saber "had not received any performance appraisals for years" and (2) DFS's policy requires evaluations to be issued on the anniversary of the employee's start date, which for Saber was early October.

### 2.  The Interim Evaluation Reports

Beginning in November 2013, Saber was assigned to conduct on-site examinations for "two very small financial institutions with little or no capital markets activity," Summit Mortgage Bankers ("Summit") and Emigrant Bank.  He was first assigned to a surprise examination of Summit.  The Examiner in Charge ("EIC") was Myra Francis, who reported to Helen Hodge, a Principal Bank Examiner II.  On December 19, 2013, Logan sent an email to Hodge asking if she could provide an Interim Evaluation Report ("IER") on Saber's work on the Summit examination and identifying for Hodge several alleged deficiencies in Saber's work.  The request for an IER was atypical; Hodge noted to Logan and Cappello that the IER was "the

first time that [CMD] ha[d] asked for an IER on their staff" and that "we generally[] do not write IERs for Specialists."

In January 2014, Hodge sent the IER to Logan.  Logan said he approved of the IER, telling Hodge that he thought the "EIC did a great job [in preparing the IER] and skillfully worded a SAT [Satisfactory] IER with an UNSAT [Unsatisfactory] narrative."  Sometime between January 14 and March 10, Hodge provided the IER to Saber.

Saber was also assigned to work on the examination of Emigrant Bank around January 2014.  Logan asked that an IER be prepared "[u]pon completion of [Saber's] contribution to the exam."  The IER for the Emigrant Bank examination gave Saber a Satisfactory rating and, unlike the IER for the Summit examination, included only positive feedback of his performance.

### 3.   Saber's Mid-Year Performance Review

On May 9, 2014, Cappello and Logan gave Saber a mid-year performance review, which covered the 6-month period beginning October 2013.  The document states, "If a rating were assigned today based upon service to date, I [Cappello] would propose that it be: Unsatisfactory," but does not contain any explanation or narrative.  Saber attests that the document was "issued to [him] without any explanation whatsoever."  This was the first time that Saber had received an "Unsatisfactory" rating in a mid-year performance review.

### F.    The May 2014 Cubicle Assignment

In May 2014, Cappello sent an email regarding Saber's cubicle assignment.  It states: Logan "asked me to tell [Saber] that he no longer has a permanent cub[icle] outside my office, and he has to go to Wendy to reserve space, like other examiners.  I'm not sure I agree with the decision, especially with the EEOC claim, but [Logan] insisted."

### G.      Saber's Amended EEOC Charge and Notice of Discipline

Plaintiff filed an amended EEOC Charge on June 3, 2014.  On July 10, 2014, DFS

informed Saber that he was likely subject to disciplinary action.  The next month, Gollop

conducted an official interrogation of Saber in connection with the proposed disciplinary action.

On October 3, 2014, Saber received a notice of discipline.  The notice contains three

charges, which were based primarily on Saber's involvement in the examinations of Summit and

Emigrant Bank.  The first two charges were that Saber failed to (1) comply with supervisory

requests and (2) conduct himself in an "an appropriate and professional manner."  Both charges

cite Saber's response to Cappello assigning him to the Summit examination, including Saber

allegedly "questioning the rationale and/or wisdom of" the examination.  The third charge

alleges that Saber failed to perform his duties "in a satisfactory and/or competent manner."  This

charge was based on the "Product Memos" ("PM") he submitted in connection with the Summit

and Emigrant Bank examinations, as well as his review of the PMs that other CMD employees

had prepared.  The notice of discipline proposed suspending Saber for 20 days without pay.

Later in October 2014, Saber received his annual performance evaluation, which covered

his performance from October 2013 to October 2014.  The evaluation rated Saber's performance

as "Satisfactory" and states, "Nasser Saber performed all duties assigned to him in a satisfactory

manner[.]  He fulfilled his tasks and objectives as listed in the performance program."  This was

intended to reflect his improved performance during the last six-months of the review period.

### H.      The Arbitration Hearing and Decision

A disciplinary hearing before an arbitrator from the American Arbitration Association

was held on three dates in April and May 2015.  The parties excluded the issues of employment

discrimination and retaliation from the hearing.

On July 2015, the arbitrator rendered a decision, concluding that some -- but not all -- of DFS's charges were unsubstantiated. She found that, although DFS had proved that Saber was initially "uncooperative" with regard to Cappello's assigning Saber to the Summit examination, Saber was "justifiably confused" about how it would be implemented. She also found that some of Saber's emails had a "sarcastic or caustic tone" and that his "initial PM on [the Summit examination] was not satisfactory." However, she also concluded that DFS did not prove that Saber was "incompetent or [that he] engaged in deliberate misconduct" regarding the Summit and Emigrant Bank examinations. She also found that DFS had not shown that Saber's comments on the PMs prepared by others were "superficial," "lacked insight" or "were acerbic, caustic, inappropriate, and unprofessional."

The arbitrator rejected DFS's proposed penalty of a 20-day suspension (four full work weeks) without pay, finding that "the agency did not prove most of the charges, and the type of misconduct proved does not warrant such a severe penalty." She recommended instead formal written counseling and gave two reasons. First, "there was no evidence that the agency has imposed suspensions without pay of any length for similar types of isolated incidents of an uncooperative employee or for being tone-deaf in e-mail communications." Second, she wrote that suspension without pay for even one day is "a fairly serious penalty and the misconduct in this case is relatively minor." As she explained, "[t]he recalcitrance and intermittent 'tone' problems are the types of things that often can be resolved through counseling, especially for an employee who has enjoyed an almost blemish-free 14-year tenure at DFS."

## II.    STANDARD

Summary judgment is appropriate where the record before the court establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  Fed. R. Civ. P. 56(c)(1); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Victory v. Pataki*, 814 F.3d 47, 58–59 (2d Cir. 2016).  Courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  *See Young*, 135 S. Ct. at 1347.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S at 248.

## III.    DISCUSSION

Saber alleges in three causes of action that DFS violated Title VII for (1) discrimination based on national origin because he is of Iranian, Persian and Middle Eastern national origin; (2) discrimination based on religion because he is Muslim; and (3) retaliation for complaining about such discrimination.

### A.    Discrimination

#### 1.  Failure to Promote

Saber alleges that DFS discriminated against him when it failed to promote him to the CRMS positions and instead selected Cappello, Taam and Bumgardner.  As explained below, summary judgment is granted in part, with respect to the selection of Taam only.

### a. Statute of Limitations

DFS argues that the failure-to-promote claim[2] is untimely because Saber applied for the CRMS position in 2012, but did not file his EEOC Charge until November 27, 2013, more than 300 days later.  This argument is incorrect because the claim did not accrue until 2013 and therefore is timely.

Title VII requires a plaintiff to file a claim with the EEOC within 300 days of an alleged adverse action.  *See* 42 U.S.C. § 2000e–5(e)(1).  "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct."  *Alleyne v Am. Airlines, Inc*., 548 F.3d 219, 222 (2d Cir. 2008) (quoting *Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir. 2000)).  Saber filed his EEOC Charge on November 27, 2013.  Thus any claim that accrued on or after January 31, 2013, is timely.

Construing the evidence in the light most favorable to Saber, as required on this motion, a reasonable jury could conclude that Saber's failure-to-promote claim accrued on or after January 31, 2013.  According to Saber, although he applied for the promotion to CRMS in 2012, he did not learn he had been denied the promotion until August 2013, when he met Cappello, who had been selected for the position.  Contrary to DFS's assertion, the fact that Saber initially applied for the CRMS position in 2012 does not render his claim untimely.  *See Dawson v. N.Y.C. Transit Auth.*, 624 F. App'x 763, 768 (2d Cir. 2015) (summary order) (noting that the

---

[2] The Complaint asserts two causes of action based on discrimination under Title VII, one based on national origin and the other based on religion.  Both causes of action proceed on several identical theories -- failure to promote, denial of his out-of-title grievance and other discriminatory acts, which are addressed in turn below.  For ease of reference, both causes of action based on discrimination are addressed simultaneously, and the various theories on which they proceed are referred to as "claims."

"limitations period cannot sensibly be read to require that the plaintiff have *applied* for a job, promotion, or transfer no more than 300 days prior to filing his EEOC complaint").  In addition, that DFS re-announced the CRMS position in July 2012 after Saber had been interviewed does not establish as a matter of law that Saber had notice at that time that he had been rejected for the position.  Saber attests that DFS had previously "re-announced" positions for "a variety of reasons."

With respect to the selection of Taam and Bumgardner over Saber, the evidence shows that Saber did not learn that they had been selected over him until after January 31, 2013.  Taam began working for DFS in February 2013, and Saber attests that he did not know that she had been hired until he met her that same month.  As to Bumgardner, although the date of her selection is not in the record, the evidence suggests that she was interviewed in January 2013 and that Saber did not learn that she was selected until after he commenced this lawsuit.  Thus the statute of limitations does not bar Saber's discrimination claims based on the alleged failure to promote.

### b.  Application of the *McDonnell Douglas* Framework

At summary judgment, Saber's discrimination claims under Title VII are subject to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). "Under that framework, a plaintiff must first establish a *prima facie* case of discrimination, which causes the burden of production to shift to the defendant to offer a legitimate, nondiscriminatory rationale for its actions."  *Id.*  "If the defendant satisfies its burden of production, then the presumption raised by the *prima facie* case is rebutted and drops from the case, such that at the final stage, the plaintiff then has the opportunity to demonstrate that the

proffered reason was not the true reason for the employment decision." *Id.* (internal quotation marks and alterations omitted).

At step one of the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case. For a discriminatory failure-to-promote claim, a plaintiff ordinarily must demonstrate that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Aulicino v N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)).

Construing the evidence in the light most favorable to the non-moving party, Saber has made a prima facie case of discrimination based on DFS's failure to promote Saber to the CRMS position assigned to Cappello. First, Saber is a member of a protected class. Second, he applied to the position and a reasonable jury could conclude that he was qualified -- Saber was interviewed for the position, and DFS's own witness testified that DFS interviews a candidate only if HR and the responsible agency division determine that the candidate is qualified. Third, DFS never offered Saber the job. Fourth, DFS continued to seek applicants, including by re-announcing the same job vacancy several months later.

Regarding the second step of the *McDonnell Douglas* inquiry, DFS has adduced evidence of a non-discriminatory reason for not selecting Saber -- that he performed poorly at his interview. Logan testified that Saber did not demonstrate a sufficient understanding of the topics addressed at the interview. Also, a document prepared shortly after the interview states that Saber said he would only do the job "with reluctance." Thus the burden shifts back to Saber to

14

show that the "proffered reason was not the true reason for the employment decision." *Kovaco*, 834 F.3d at 136.

Saber is able to satisfy his burden on this record. To survive summary judgment at the last step of the *McDonnell Douglas* analysis, "the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (internal quotation marks and alterations omitted). The relevant issue is the employer's motivation and not whether the employment decision was sound or the assessment of the plaintiff was accurate. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer . . . ." (internal quotation marks omitted)). Even so, "[c]ourts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001).

In this case, the evidence as a whole, construed in the light most favorable to Saber for purposes this motion, provides a sufficient basis for a reasonable jury to conclude that DFS's explanation for failing to promote Saber was pretext for impermissible discrimination. First, the evidence suggests that Saber was knowledgeable about the topics discussed at the interview. Saber attests that they were "topics on which [he had] both written and taught" and that, during the interview, he did not limit his "discussion to narrow areas of particular assignments" on which he worked. The evidence also indicates that Saber "create[d] a program in risk

management at NYU's business school and taught there from 1993 to 2003," as well as wrote "two books on interest rate swaps and speculative capital."  An affidavit from DFS acknowledges that Saber's resume "reflected that he had performed extensive securities operations work" on certain jobs discussed at the interview.  This evidence as to Saber's qualifications undermines the credibility of DFS's proffered reason for denying him the CRMS position.  *See Byrnie*, 243 F.3d at 105 ("Based on [the plaintiff's] 21½ years teaching experience, it does not seem difficult to take issue with the credibility of [the defendant's] assertion that [the plaintiff] lacks 'familiarity with the basic competencies necessary for effective teaching.'").  Saber also attests that he never stated at the interview that he would do the job only "with reluctance," thus creating a factual dispute as to whether Saber made the statement that formed part of the purported basis for DFS's decision.

Second, a reasonable jury could conclude that the evidence regarding Cappello's qualification and selection process casts doubt on DFS's explanation that Cappello was the better candidate because Saber performed poorly in his interview.  The evidence suggests that Cappello did not impress DFS.  After interviewing Cappello along with five other candidates, Logan sent an email in January 2013 stating that "from a technical point of view" Cappello "faired the wors[t]."  He also noted that "his experience is largely one dimensional and his responses to the motivational questions were near the bottom.  He doesn't possess the brea[d]th of experience or product knowledge to lead either team."  Saber also points to evidence that would permit the inference that Saber was more qualified.  He notes that Cappello, unlike Saber, had no advanced degree and that when Cappello was assigned to be Saber's supervisor, Logan told Saber that he should "help educate" Cappello due to his "technical deficits."

Third, Saber adduces evidence regarding statements from Logan that support the inference that he possessed discriminatory animus.  Courts "have long recognized that actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus may give rise to an inference of discriminatory motive." *Gregory v. Daly*, 243 F.3d 687, 697 (2d Cir. 2001) (internal quotations mark omitted).  "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Saber testified that Logan, who was one of the decisionmakers with respect to the CRMS position, made two statements that were disparaging towards Saber based on his national origin and religion.  First, in late 2011, when Saber was assigned to CMD, Logan told him that, because Saber did "not have a Rabbi," he had to "watch himself."  Second, in mid-2014, when DFS employees had to take a training course on hazardous materials, Logan told a group of employees that the training was happening "because [Saber was] hiding [yellowcake] in his cubicle."  Saber explained that yellowcake refers to "material for [a] nuclear bomb" and that the comment was connected to Iran's attempt to develop nuclear capabilities. Based on these statements -- which, if made, could reveal a negative attitude towards Saber's national origin and religion -- and the record as a whole, a reasonable jury could conclude that DFS's reason for failing to promote Saber to the CRMS position was pretext and that Saber's national origin, religion or both were motivating factors for the decision not to promote Saber.

Summary judgment is also denied with respect to DFS's failure to promote Saber to the CRMS position for which Bumgardner was selected.  Saber has established a prima facie case. The first, third and fourth elements are met for the reasons stated above.  With regard to the

17

second element, although a plaintiff ordinarily must apply for the position, *Petrosino*, 385 F.3d at 227, this requirement is excused if a plaintiff demonstrates "that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* This exception applies here. While Saber did not apply for the position, he attests that (1) the position was "never announced or opened up to competition," and (2) he did not know about the position or Bumgardner's selection until after the lawsuit was filed. Even though the evidence indicates that DFS interviewed Bumgardner for the CRMS position for which Cappello was hired (i.e., a position that DFS announced), a reasonable jury could conclude that DFS offered Bumgardner another CRMS position that was unannounced.

As DFS does not address the selection of Bumgardner, it has not articulated a legitimate, non-discriminatory reason for selecting Bumgardner over Saber. Even assuming that DFS offered Saber's interview as the reason he was not promoted, Saber has adduced sufficient evidence that any such justification is pretext. As with Cappello, a reasonable jury could conclude that Bumgardner performed poorly during the interview and was far less qualified than Saber. An interview-evaluation form states that Bumgardner had "limited product experience" and gave "weak response[s] to several questions, especially those involving project management." Logan ranked her last out of the seven applicants that were interviewed. The evidence also indicates that she did not meet the "minimum qualifications" stated for the previous CRMS announcements: she had no "experience planning and conducting examination[s] of the capital markets activities of banks and/or insurance companies, and she had no experience in trading and risk management."

Summary judgment, however, is granted with respect to the DFS's failure to promote Saber to the position for which Taam was selected.  Taam was hired in the Insurance division, while Saber had applied for the CRMS position in the Banking division.  Even if Saber was qualified for this insurance-related position and could otherwise satisfy the prima facie case, DFS has put forth evidence of a legitimate, non-discriminatory reason for selecting Taam over Saber -- she was the more qualified candidate.  Her resume shows that she had "extensive experience in capital marks work that involved sophisticated financial instruments" and "held positions at high levels of responsibility."

Saber fails to meet his burden to show the proffered reason is pretext.  In contrast to the hiring decision regarding Cappello and Bumgardner, there is no evidence that Taam performed poorly during her interview, or that anyone involved in the decision-making process had reservations about her qualifications.  In addition, Logan -- who Saber alleges made disparaging remarks regarding his national origin and religion -- was not involved in either interviewing or selecting Taam.

Saber's argument that DFS's reason is pretext because he was better qualified is unavailing.  To show pretext on this basis alone, a plaintiff must show that his credentials are "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Byrnie*, 243 F.3d at 103.  Saber fails to meet this standard.  His statement that Taam had "far lesser qualifications" than he did is too conclusory.  *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (observing that a plaintiff must produce something more than "conclusory allegations").  Logan's testimony that Taam's resume and work history "showed a lack of maturity" falls short, as Logan was not involved in hiring Taam

and this remark does not show that no "reasonable person" could have chosen Taam over Saber for the position. *Byrnie*, 243 F.3d at 103.

In sum, the failure-to-promote claim survives summary judgment, but only with respect to the selection of Cappello and Bumgardner.

### 2. Denial of Out-of-Title Grievance

Saber also alleges that DFS discriminated against him by denying his out-of-title grievance, which requested that DFS designate him a Supervising Risk Management Specialist with a grade level of 31. Summary judgment is granted with respect to this theory of discrimination.

Even assuming that Saber could establish a prima facie case, DFS has proffered a legitimate, non-discriminatory reason for the denial -- that Saber did not satisfy the New York State Department of Civil Services Classification Standard set for the Supervising Risk Management Specialist position. According to Gollop, Saber did not conduct examinations of capital markets activities at the "largest, most complex institutions, especially large money-centers," as required by the Classification Standard.

Saber cannot show this reason is pretext. The pretext inquiry is whether Gollop was "*insincere* in [his stated] belief" that Saber did not satisfy the classifications standards established by the New York State Department of Civil Service. *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74 (2d Cir. 2015). Saber's assertion that Gollop did not investigate the job duties of other Supervising Risk Management Specialists in Saber's division is beside the point. Because, as Gollop found at the time, Saber was not working on examinations of the largest, most complex institutions -- a requirement for Grade 31 -- Saber fails to show that DFS's justification was pretext. Further, while Saber did not agree with Gollop's application of the

classification standards, noting, for instance, that he "think[s]" at least one of the entities he was examining was "large and complex," such disagreement with Gollop's judgment does not demonstrate pretext on this record. *See id.* at 73 ("Title VII is not an invitation for courts to sit as a super-personnel department that reexamines employers' judgments[.]" (internal quotation marks omitted)); *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) (noting that an employer's reasons "need not be well-advised, but merely truthful").

### 3.  Other Alleged Discriminatory Acts

Saber asserts that other conduct by DFS constitutes actionable discrimination.  He points to (1) his cubicle assignments, (2) his counseling session and negative performance evaluations, (3) the assignment of "less meaningful work," (4) his designation as a "Desk Examiner" and (5) the notice of discipline.  Summary judgment is granted on Saber's discrimination claim to the extent it is based on these actions because Saber cannot prove a prima facie case.

A plaintiff may establish a prima facie case of discrimination by showing "(1) he is a member of a protected class; (2) he is qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (internal quotation marks omitted).  With respect to the third element, "[a]n employee suffers an adverse employment action if he endures a materially adverse change in the terms and conditions of employment.  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted).

Saber's complaint about his cubicle assignments, including that he was given two undesirable, windowless cubicles, falls into the category of a "mere inconvenience" and

therefore is not a materially adverse change in the terms and conditions of his employment.  *See Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11–12 (2d Cir. 2013) (summary order) (holding that cubicle assignment was not materially adverse change); *Whitley v. Montefiore Med. Grp.*, No. 13 Civ. 4126, 2016 WL 1267788, at *7 (S.D.N.Y. Mar. 30, 2016) (holding that the defendant's "failure to provide [the plaintiff] with her own office or computer does not rise to the level of an adverse employment action within the meaning of . . . Title VII"); *Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 847 (S.D.N.Y. 2011) ("Undesired office assignments are not adverse employment actions.").

The negative performance reviews, which include the mid-year rating of "Unsatisfactory," do not constitute adverse employment actions.  "As a matter of law, an 'unsatisfactory' performance evaluation alone does not amount to an adverse employment action because such an evaluation does not constitute a material change in employment."  *Davis v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3812, 2012 WL 139255, at *6 (E.D.N.Y. Jan. 18, 2012) (collecting cases); *Chukwuka v. City of New York.*, 795 F. Supp. 2d 256, 262 (S.D.N.Y. 2011) ("[C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (internal quotation marks omitted)).  Although Saber was displeased with the review, he has not adduced evidence that the negative evaluations resulted in a material adverse change in the terms and conditions of his employment.  For the same reason, the counseling session with Taam and accompanying memorandum also are not adverse actions for his discrimination claim.  *See, e.g.*, *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[I]n the context of the issuance of a counseling memo, . . . criticism of an employee (which is part of training and necessary to allow

employees to develop, improve and avoid discipline) is not an adverse employment action." (internal quotation marks omitted)); *Williams v. N.Y.C. Hous. Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009) (summary order) (holding that "issuance of two counseling memoranda" did not amount to an adverse employment action); *Quadir v. N.Y. State Dep't of Labor*, No. 13 Civ. 3327, 2016 WL 3633406, at *5 (S.D.N.Y. June 29, 2016) (holding that issuance of counseling memo and "unsatisfactory" evaluation without more do not constitute a materially adverse employment action for purposes of discrimination claim); *see also Self v. Dep't of Educ. of the City of New York*, 844 F. Supp. 2d 428, 435 (S.D.N.Y. 2012) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.").

Saber also cannot prevail on his discrimination claim to the extent he alleges he was given less meaningful work and designated a "Desk Examiner" for three months in 2013. With respect to the Desk Examiner designation, Saber adduces no evidence that his official title (Principal Risk Management Specialist), grade level or compensation was in any way lowered as a result of this temporary designation. *See Leget v. Henderson*, No. 99 Civ. 3636, 2001 WL 43615, at *6 (S.D.N.Y. Jan. 18, 2001) (holding that "[the plaintiff's] three-week assignment to [a different] shift" was not an adverse employment action where it "resulted in no change in [her] salary, title, or benefits"). Likewise, the temporary decrease in the amount of work in late 2013, by itself, does not rise to the level of a materially adverse action. *See Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 404–07 (S.D.N.Y. 2014) (holding that the employee's allegations that the defendants, among other things, gave her undesirable assignments and shifts did not rise to the level of an adverse employment action); *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 154 (S.D.N.Y. 2011) (holding that employee's alleged adverse employment actions, which included her supervisor taking away responsibilities, routinely

excluding her from important decisions and conference calls and preventing her from attending senior management meetings did not rise to the level of material adversity needed to survive summary judgment).  Thus summary judgment is granted to the extent Saber claims his was discriminated based on such conduct.

As to the notice of discipline, Saber has failed to raise a genuine factual dispute that either DFS's investigative process or the outcome of that process constituted an adverse employment action for purposes of his discrimination claim.  First, he failed to adduce evidence that the outcome of the process entailed a materially adverse change in his terms and conditions. The proposed sanction contained in the Notice of Discipline -- 20 days suspension without pay -- was never imposed.  *Henry*, 18 F. Supp. 3d at 407 ("[T]he threat of disciplinary action, without more, does not constitute an adverse employment action.").  Rather, the arbitrator imposed formal written counseling, which was the kind of counseling that Saber previously received from Taam.  For the reasons state above, Saber has failed to show that being subject to another counseling session two years after his first constituted an adverse employment action.  *See Tepperwien,* 663 F.3d at 570.  Second, the fact that he was subject to DFS's investigative process and required to attend an arbitration hearing does not create a materially adverse change in the terms and conditions of his employment.  "[T]he terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances."  *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006).  "The relevant question is therefore whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph*, 465 F.3d at 92 n.1); *see Joseph*, 465 F.3d at 90–93 (holding

that being "placed on administrative leave with pay during pendency of [the plaintiff's] criminal case and for approximately five months thereafter" did "not materially alter the terms and conditions of [the plaintiff's] employment"). Saber fails to adduce evidence that DFS conducted "an exceptionally dilatory investigation" or otherwise exceeded the pre-existing procedures in connection to the notice of discipline. *Joseph*, 465 F.3d at 92. Accordingly, because the discipline ultimately imposed was reasonable, and the disciplinary process itself was not unjustified, summary judgment is granted on the discrimination claim to the extent it is based on the notice of discipline.

### B.    Retaliation

Saber claims that DFS unlawfully retaliated against him with each of the following acts: (1) the counseling session in 2013, (2) the negative performance appraisals in 2014, (3) the notice of discipline, (4) the cubicle reassignment in 2014 and (5) the reduction in job responsibilities in 2014. The retaliation claim survives, but summary judgment is granted in part to narrow the claim.

"Under the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (internal quotation marks omitted). "This showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action." *Ya-Chen Chen*, 805 F.3d at 70 (internal quotation marks omitted). If the defendant provides a non-retaliatory reason, then "the plaintiff must prove 'that the desire to retaliate was the but-for cause

of the challenged employment action.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2528 (2013)).

### 1.   Counseling Session

The July 2013 counseling session and follow-up memorandum are not actionable.  Saber argues that DFS took these actions in retaliation for the out-of-title grievance he filed in June 2013.  "[U]nion grievances that do not complain of discrimination do not constitute a protected activity."  *Melie v. EVCI/TCI Coll. Admin.,* 374 F. App'x 150, 153 n.* (2d Cir. 2010) (summary order); *accord Forest v. N.Y. State Office of Mental Health*, No. 13 Civ. 1762, 2015 WL 6965149, at *7 (S.D.N.Y. Nov. 10, 2015).  Saber's out-of-title grievance is not protected activity because it does not reference discrimination and does not refer to the national origin or religion of either Saber or any other employee.  Summary judgment is granted to the extent the retaliation claim is based on DFS's response to the June 2013 out-of-title grievance.

### 2.   Negative Performance Reviews and Notice of Discipline

Saber's claim that his negative performance reviews and notice of discipline were in retaliation for his filing an EEOC Charge, a protected activity, survives this motion.

Saber has presented sufficient evidence to make out a prima facie case.  The first two elements -- a protected activity and defendant's knowledge of it -- are satisfied because the EEOC Charge was served on DFS in December 2013.

Saber also has shown an adverse employment action, the third element.  To satisfy this element, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  "This definition covers

a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (alteration in original) (quoting *White*, 548 U.S. at 64).

A reasonable jury could find that a negative performance review and a notice of discipline threatening a twenty-day suspension are sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. *See id.* at 92 ("[A] negative evaluation, or the threat of a negative evaluation . . . might dissuade a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks omitted)); *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 389 (S.D.N.Y. 2011) (denying summary judgment because a reasonable jury could find that counseling memoranda, negative performance evaluation and notice of discipline in combination constitute adverse employment action for purposes of retaliation).

Saber also satisfies the fourth element of a prima facie case by providing evidence of a causal relationship between the EEOC Charge and the negative performance reviews and notice of discipline. A causal relationship between the protected activity and the alleged retaliatory act can be established in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (internal quotation marks omitted).

Here, evidence of temporal proximity combined with other circumstances support an inference of causation.  DFS received notice of Saber's EEOC Charge on approximately December 18, 2013.  On January 10, 2014, less than a month later, Logan provided Saber with a performance review that contained negative comments.  The passage of approximately one month between the protected activity and the retaliation may give rise to an inference of causation.  *See Nagle v. Marron,* 663 F.3d 100, 111 (2d Cir. 2011) ("While we have not drawn a bright line defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw." (internal quotation marks omitted)); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) (one month time span between the protected activity and suspension was "short enough to permit a jury to infer a causal connection").  The circumstances were also suspect: Saber had never before received negative comments in a performance review and had not received a performance review for several years preceding the January 2014 review.  The DFS policy was to review employees on their anniversary date, which would have been October for Saber.  Further, about one month lapsed between Saber filing his amended EEOC Charge in June 2014 and DFS telling him that he likely would be subject to a disciplinary proceeding, which culminated in the October 2014 notice of discipline, and ultimately mixed findings by the arbitrator.

Also relevant to causation are the arbitrator's findings that most of the disciplinary charges were unfounded.  *See Jasmin v. N.Y. State Dep't of Labor*, No. 04 Civ. 10237, 2007 WL 1746909, at *7 (S.D.N.Y. June 15, 2007) (citing arbitrator's upholding of disciplinary charges as relevant to plaintiff's retaliation claim).  The arbitrator also found that the sanction DFS sought was unduly harsh for what she found to be "relatively minor" misconduct.  Because Saber's evidence is sufficient to establish a prima facie case, the burden shifts to DFS.

DFS meets its burden of offering a legitimate, non-discriminatory reason for the negative performance reviews and notice of discipline.  The arbitrator upheld some of DFS's disciplinary charges against Saber.  Likewise, Cappello attests that he gave Saber a negative mid-year review because Saber could be "caustic" and his work product was not satisfactory, two findings supported by the arbitrator's decision.

Saber's evidence of causation, recounted above, is sufficient not only to establish a prima facie case, but also provides a basis from which a reasonable jury could conclude that the desire to retaliate was the but-for cause of the negative performance review and notice of discipline. *See Ya-Chen Chen*, 805 F.3d at 73.  Therefore, summary judgment is denied on Saber's retaliation claim based on the negative performance review or notice of discipline.

### 3.   May 2014 Cubicle Assignment

Summary judgment is granted on Saber's retaliation claim to the extent it is based on evidence that, in May 2014, DFS decided that Saber would no longer have a permanent cubicle and instead needed to request one each week.  Even assuming that Saber could make a prima facie case, *but see Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 1398, 2015 WL 7736554, at *11 (S.D.N.Y. Nov. 30, 2015) ("[A]n intra-office reassignment does not ordinarily qualify as a material adverse action sufficient to sustain a retaliation claim . . . ."), DFS has offered a legitimate, non-discriminatory reason for the cubicle reassignment, which Saber does not overcome.  Cappello attests that, given the limited number of workstations available, specialists who conduct on-site examinations at financial institutions were not given permanent cubicles and instead were assigned "hoteling" workstations.  Saber concedes that he conducted on-site examinations and does not directly dispute Cappello's testimony.  Instead, he cites an email from May 2014 in which Cappello states that Saber "no longer has a permanent cub[icle]

outside my office, and he has to go to Wendy to reserve space, like other examiners."  Cappello

also states, "I'm not sure I agree with the decision, especially with the EEOC claim, but [Logan]

insisted."  Cappello's mere acknowledgement of the EEOC Charge is not sufficient for a

reasonable jury to conclude that the EEOC Charge was the but-for cause of the cubicle

reassignment.  Summary judgment is granted on this aspect of the retaliation claim.

### 4. Job Assignments

Saber also alleges retaliation based on DFS's limiting his work assignments in 2014.

Summary judgment on this basis is denied.

Saber establishes a prima facie case.  "Courts have found that . . . significantly

diminished job responsibilities could reasonably dissuade an employee from engaging in

protected activity."  *Aponte v. Modern Furniture Mfg. Co., LLC*, No. 14 Civ. 4813, 2016 WL

5372799, at *15 (E.D.N.Y. Sept. 26, 2016); *see Kessler v. Westchester Cty. Dep't of Soc. Servs.*,

461 F.3d 199, 209–10 (2d Cir. 2006).  Saber attests than he was the only specialist in his division

who conducted no on-site examinations for a period of months and that the examinations he

received were "lesser assignments" because of his limited responsibilities.  He also cites an email

from Cappello stating that he would be assigning Saber to at least two on-site examinations but

that Saber "won't be happy with any of them [because] they're all small, foreign banks.  They're

below him."  This evidence of disparate treatment along with the fact that it occurred in the

months following the filing of his EEOC Charge support an inference of causation.

DFS counters by adducing evidence that Saber was not given significantly diminished job

responsibilities.  DFS misunderstands the *McDonnell Douglas* inquiry, which at the first stage

requires only that Saber put forward evidence sufficient to establish a prima facie case, which in

effect creates a rebuttable presumption of retaliation.  *See Kovaco*, 834 F.3d at 136.  The burden

then shifts to DFS to articulate a legitimate, non-discriminatory reason for the alleged adverse action.  DFS fails to sustain that burden, as it cites no evidence to address *why* Saber was not assigned on-site examinations for several months or assigned "lesser assignments."  Summary judgment is denied to the extent Saber alleges that DFS's reducing his job responsibilities in 2014 was retaliatory.

## IV.    CONCLUSION

For the foregoing reasons, DFS's motion for summary judgment is GRANTED in part and DENIED in part.  Saber's discrimination claim survives summary judgment to the extent it is based on the failure to promote him to the CRMS positions for which Cappello and Bumgardner were selected.  His retaliation claim survives summary judgment to the extent it is based on the negative performance reviews, the notice of discipline and the assignment of lesser job responsibilities in 2014.  His claims are dismissed in all other respects.  Saber's motion for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to the close the motions at Dkt. Nos. 35 and 54.

Dated: March 10, 2017
        New York, New York

                                   LORNA G. SCHOFIELD
                               UNITED STATES DISTRICT JUDGE

31