UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                      :

NASSER SABER,                      :

                         Plaintiff,   :

                                          :         15 Civ. 5944 (LGS)

          -against-          :

                                          :      **OPINION AND ORDER**

NEW YORK STATE DEPARTMENT OF     :
FINANCIAL SERVICES,
                                       :
                        Defendant. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      Upon resolution of Defendant New York State Department of Financial Services

("DFS")'s motion for summary judgment, the following issues remained for a jury: (1) whether

the failure to promote Plaintiff to the Chief Risk Management Specialist ("CRMS") position was

discrimination prohibited under Title VII; (2) whether the negative performance reviews, the

unsatisfactory mid-year rating, the issuance of charges with a proposed 2-day suspension or the

assignment of lesser job responsibilities in 2014 was in retaliation for Plaintiff's complaint

against DFS filed with the U.S. Equal Employment Opportunity Commission ("EEOC"); and (3)

the amount of damages for Plaintiff Saber's emotional distress, if any.

      After a six-day trial, on December 19, 2017, the jury (1) found that Defendant DFS had

discriminated against Plaintiff Saber based on national origin, but not religion, when it did not

promote him to CRMS, (2) found that Defendant DFS had retaliated against Plaintiff Saber for

filing the EEOC complaint, and (3) awarded Plaintiff $2.5 million in damages for his emotional

distress.

      Defendant DFS moves pursuant to Federal Rules of Civil Procedure 50 and 59 for a

judgment in its favor as a matter of law or, in the alternative, for remittitur of the jury's damage

award.  Plaintiff moved for attorneys' fees.  For the reasons below, Defendant's motion for judgment is denied, and its motion for remittitur is granted in part.

## I.    BACKGROUND

### A.    Trial

In reviewing the trial evidence on a Rule 50 motion, the court draws all reasonable inferences in favor of the non-moving party, and it does not make credibility determinations or weigh the evidence.  *Harris v. O'Hare*, 770 F.3d 224, 233 (2d Cir. 2014) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  The following is a summary of the evidence at trial.

#### 1.  Background

DFS was the product of a merger between the New York State Banking Department and the New York State Insurance Department in October 2011.  Around that time, the U.S. Government imposed sanctions on any entity engaging in business or dollar transactions with Iran.  DFS became known as "the new sheriff in town going after the banks that were violating [the U.S. sanctions against Iran]."

Plaintiff was born in Iran and is Muslim.  Plaintiff became an American citizen in 1995 and has a wife and two children.  Plaintiff is highly educated.  Plaintiff has a Bachelor's of Science in engineering from Tabriz University in Iran, a Master's of Science in engineering from Case Western Reserve University in Cleveland, Ohio, and a Master's of Business Administration in quantitative analysis and finance from New York University.  Plaintiff joined the New York State Banking Department in 2001, as a senior risk specialist in the capital markets department, a level 25 position.  He was promoted to principal risk management specialist, a level 29 position, in October 2007.

### 2. The Chief Risk Management Specialist Hiring

On March 12, 2012, DFS announced on its intranet the vacancy of the CRMS position. Later that month, Saber applied for the position, and in June 2012, he was interviewed. In July 2012, DFS decided not to hire Saber as CRMS but did not notify him. DFS was unable to fill this position despite making an offer to several people.

In September 2012, DFS reposted the opening for CRMS. Saber again applied, not knowing the outcome of his first application. In January 2013, seven candidates were interviewed, including John Cappello and Olivia Bumgardner. Among those conducting the interviews was David Logan, the Assistant Deputy Superintendent of Banks at DFS to whom the CRMS reports. Saber was not interviewed. John Cappello was ultimately hired for this position in February 2013, to start in May 2013. Two years later in August 2015, Bumgardner was hired for the CRMS position.

The notes from the January 2013 interview revealed that Cappello was not initially nominated for hiring because he was ranked fourth out of the seven candidates. Cappello was an external candidate who had never worked for a regulatory agency. After Cappello began working as CRMS, Plaintiff had "to educate Mr. Cappello and teach him the ways because he was technically deficient."

The notes from the January 2013 interview also reveal that Bumgardner "was not nominated [for hiring] due to lack of management experience, limited product experience, and weak response to several questions, especially those involving project management."

### 3. The Out-of-Title Grievance

On June 11, 2013, Plaintiff filed an out-of-title work grievance, seeking to change his pay grade level from 29 to 31, because he performed the same duties as those at grade level 31. In

this grievance, Plaintiff stated that the "grieved duties began 10/01/2011" and that "grieved duties . . . [are] ongoing."

### 4. The Counseling and the Counseling Memorandum

On June 30, 2013, Anna Taam, Plaintiff's direct supervisor until August 12, 2013, called Plaintiff into a formal counseling session during which she expressed concern about Plaintiff's work product. This was the first time in twelve years of employment at DFS that Plaintiff had received formal counseling. Immediately following the session, Plaintiff received a formal counseling memorandum outlining Anna Taam's concerns regarding Plaintiff's performance and attitude. The counseling memo stated that Plaintiff was hostile towards his coworkers. On the same day, Plaintiff was informed that he would report to Cappello, not Taam, as he had been transferred.

### 5. The EEOC Complaint and Subsequent Events

Around November 27, 2013, Plaintiff filed a charge of discrimination with the EEOC. Defendant communicated with the EEOC from late December 2013 until around September 2014.

On January 10, 2014, Saber received a performance evaluation, signed by Cappello and Logan. Cappello testified that he had not been aware of Plaintiff's EEOC complaint at this time. The evaluation reflected substantially similar concerns as those raised in the counseling session, the narrative was negative, but the overall performance rating was described as "satisfactory." This was Plaintiff's first formal evaluation since 2006. On January 14, 2014, Plaintiff received an official interim evaluation, which also contained negative comments. This was his first interim evaluation since 2006. In May 2014, Plaintiff received a mid-year evaluation, which

stated that "if a rating were assigned today, based upon [Plaintiff's] service to date," Plaintiff would receive an "unsatisfactory" rating.

In late May 2014, DFS requested its employees, including Plaintiff, to take a management course in handling hazardous material in the workplace. When a coworker asked Logan why DFS required its employees to take this course, Plaintiff testified, "Mr. Logan said that the reason is that [Plaintiff] is hiding yellow cake in his cubicle." The comment was made in front of Plaintiff and a few of his colleagues, near Plaintiff's cubicle, in the course of workplace socializing. Plaintiff explained that "yellow cake, everybody knew, was material for building atomic bomb," and that this comment occurred at a time when "there was intense negotiation going on between western powers and Iran." Plaintiff testified that this comment made him "extremely uncomfortable . . . because people turn and stare at you." In June 2014, Plaintiff amended his EEOC complaint.

On July 10, 2014, Plaintiff was informed that he was likely subject to disciplinary action. On October 3, 2014, Saber received a Notice of Discipline, which proposed a 20-day suspension without pay. Cappello issued the Notice after consulting with Logan and Scott Gollop, the head of labor relations at DFS.

An arbitration hearing for disciplinary action against Plaintiff took place in April and May 2015. At the hearing, Gollop questioned Plaintiff, and later commented, in reference to the interrogation, "I didn't waterboard you, did I?" At the time of the comment, "waterboarding was in the news with the practice of the U.S. against the Islamic terrorists." Plaintiff testified that this comment made him feel "very, very much offended," "very angry," and "also upset and concerned. The combination of all the feelings."

### 6.  Other Testimony

Manzar Sahebjam-Atabaki, the only other Iranian Muslim who worked at DFS, reported experiencing discrimination based on her national origin and religion, despite being highly educated.  Ms. Atabaki testified that after the formation of DFS in October 2011, "[t]here was a focus on finding and giving consent orders to banks and financial institutions that were violating the sanctions with Iran" at DFS.  Ms. Atabaki rose through the ranks in the banking division, and was eventually made the Assistant Deputy Superintendent of Banks, the second highest position in the entire banking division.  After the formation of DFS, she had been asked to step down from being the assistant deputy superintendent, despite being "smart in everything" without any justification.

Sarina Saber, Plaintiff's wife, testified that in the recent years, Plaintiff "has become more reserved and . . . doesn't like to engage with people that much, and kind of upset" and that Plaintiff "cannot sleep good and cannot sleep long," "is very distracted" and that he listens to music a lot "to get peace with music, like holding himself."  Mrs. Saber also testified that "I know one day he was really upset that somebody in the office saying something that he was hiding the yellowcake under his desk."  She testified that Plaintiff "was upset and shocked about [the yellowcake comment], and also very embarrassed . . . by people saying something to him in front of others.  It's insulting."  However, Plaintiff "has not sought treatment for any physical or mental conditions associated with the injuries he alleges were attributable to the actions of DFS that form the basis of this lawsuit."

## II. STANDARD

### A. Rule 50

Defendant moves for judgment as a matter of law under Rule 50(b).  Under Rule 50, "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 50(a)(1)(B).  In reviewing a Rule 50 motion for judgment as a matter of law, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe," *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014) (emphasis omitted), and "it may not make credibility determination or weigh the evidence."  *O'Hare*, 770 F.3d at 233.  "When considering a Rule 50 motion after the jury has returned its verdict, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."  *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir. 2001) (internal quotation marks and citation omitted); *accord Mulholland v. Phillip Morris USA Inc.*, No. 05 Civ. 9908, 2013 WL 12154928, at *1 (S.D.N.Y. Dec. 9, 2013).

"[T]he same standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50."  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).  Therefore, the familiar *McDonnell Douglas v. Green*, 411 U.S. 792 (1972), burden-shifting

framework[1] applies to DFS's motion for judgment as a matter of law under Rule 50. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (applying the McDonnell Douglas standard on a motion for judgment as a matter of law under Rule 50).

### B. Rule 59(a)

Under Rule 59(a), "a district court may grant a new trial even where there is substantial evidence to support the jury's verdict if the court is convinced that the verdict was manifestly erroneous." *Manley v. AmBase Corp.*, 337 F.3d 237, 246 (2d Cir. 2003); *accord Okeke v. N.Y. and Presbyterian Hosp.*, 275 F. Supp. 3d 470, (S.D.N.Y. 2017). A district court may set aside a verdict under Rule 59(a) if the verdict reflects juror confusion. *See Manley*, 337 F.3d at 246 (upholding the decision to hold a new trial under Rule 59(a) where the verdict reflected juror confusion).

### C. Rule 59(e)

Under Rule 59(e), which allows a district court "to alter or amend a judgment," courts "may alter or amend judgment to correct a clear error of law or prevent manifest injustice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014). "Remittitur is the 'process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.'" *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 600 (S.D.N.Y. 2010) (quoting *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2nd Cir. 1990)). "While respecting the jury's role in determining damages, a court may reduce an

---

[1] Under the *McDonnell Douglas* burden-shifting framework, at the first stage, the plaintiff bears the burden of establishing a prima facie case, which creates a rebuttable presumption in the plaintiff's favor. The requirements to establish a prima facie case are minimal. At the second stage, the burden shifts to the defendant to produce an explanation to rebut the presumption created by the prima facie case. If the defendant satisfies its burden of production, then the plaintiff must show that the defendant's proffered reason is a mere pretext to prevail. *Bucalo*, 691 F.3d at 128–29.

award where there is sparse evidence with respect to the magnitude and duration of emotional injury or mental distress in order to guard against awards based on speculation." *Reiter v. Metro. Trans. Auth. N.Y.*, No. 01 Civ. 2762, 2003 WL 22271223, at *8 (S.D.N.Y. Sept. 30, 2003) (citation omitted); *accord Legg v. Ulster County*, No. 09 Civ. 2017 WL 3668777, at *12 (S.D.N.Y. Aug. 24, 2017).

## III.    DISCUSSION

Defendant DFS's motion for a judgment as a matter of law is denied.  DFS's motion in the alternative for a remittitur of the jury damages award is granted in part, and the damages for emotional distress are reduced from $2.5 million to $125,000.

### A.    Rule 50 and 59 Motions

#### 1.    Procedural Requirement of Rule 50

Rule 50(a)(2) provides that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury," and in so doing, "[t]he motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  Contrary to Plaintiff's argument, Defendant complied with the procedural requirement for its Rule 50 motion.  At the close of Plaintiff's case, Defendant moved for judgment, and the Court reserved decision.  In so doing, the Court instructed Defendant to "[m]ake the motion. Don't make argument."  Because "the district court foreclosed [Defendant's] opportunity to make its argument with any specificity . . . [Defendant] cannot be faulted for failing to provide more detail" in making its Rule 50 motion.  *Blockel v. J.C. Penney Co.*, 337 F.3d 17, 25 (1st Cir. 2003); *see also Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 113 (2d Cir. 1996) (courts should not "woodenly" apply the Rule 50 specificity requirement "merely to attain an unwarranted triumph of form over substance") (internal quotation marks and citations omitted).

## 2. Discrimination Claim

### a. Jury Confusion

Defendant argues that the jury's answer to Question 3 of the verdict form is evidence of jury confusion that warrants setting aside the jury award. Plaintiff's discrimination claim is based on Defendant's July 2012, decision not to promote Plaintiff to the CRMS position. However, the jury heard evidence as to both that July 2012 decision and Plaintiff's earlier June 2013 out-of-title grievance, in which Plaintiff requested a promotion to a level 31 position, retroactive to October 2011. Question 3 of the jury verdict form asked "the date (month and year) of DFS's first decision not to select [Plaintiff Saber] for the Chief Risk Management Specialist position that was taken because of Mr. Saber's national origin and/or religion," to which the jury answered, "October 2011," the month DFS was formed, and prior to the posting of the CRMS position in early 2012.

An inconsistent jury verdict can be evidence of jury confusion warranting the setting aside of the jury verdict under Rule 59(a). *See Niagara Mohawk Power Corp.*, 252 F.3d at 599. In *Anderson v. Aparicio*, 25 F. Supp. 3d 303, 305 (E.D.N.Y. 2014), the court found substantial evidence of jury confusion warranting a new trial, because it "simply [could not] harmonize how the jury could find excessive force in violation of the Constitution, but not a state law battery." A jury verdict is inconsistent when the binding portions of a jury verdict contradict each other. *See, e.g.*, *Niagara Mohawk Power Corp.*, 252 F.3d at 599 (a jury verdict was inconsistent where the jury found that the defendant's decision to terminate the plaintiff was motivated by retaliatory animus but the defendant's decision not to hire the plaintiff as a team leader was not motivated by retaliatory animus); *Anderson*, 25 F. Supp. 3d at 305 (a jury verdict was inconsistent where a jury awarded compensatory damages but answered "no" to an inquiry about

whether the defendant caused the plaintiff's injuries, and where the jury found excessive force in violation of the Constitution but did not find state law battery).

However, not all portions of a jury verdict are binding. Pursuant to Federal Rule of Civil Procedure 39(c), "[i]n an action not triable of right by a jury, the court, on motion or on its own . . . may try any issue with an advisory jury." Fed. R. Civ. P. 39(c)(1). *See Niagara Mohawk Power Corp.,* 252 F.3d at 595–96 ("Although the parties had agreed that the determination of damages would be made by the trial judge following a jury trial on liability, the jury was asked to give an advisory verdict with respect to damages."); *Nat'l Ass'n Advancement of Colored People (NAACP) v. Acusport Corp.*, 226 F. Supp. 2d 391, 398 (E.D.N.Y. 2002) ("The decision to utilize an advisory jury where there is no right to a jury is entirely discretionary.") The advisory verdict by a jury is not binding on the Court. *See Szafran v. Sandata Tech.*, No. 03 Civ. 2606, 2009 WL 10677056, at *5 (E.D.N.Y. 2009) (declining to adopt the jury's advisory verdict in favor of the quantum meriut compensation because the evidence at trial did not support the claim).

Defendant's argument that the jury's answer to Question 3 shows jury confusion warranting setting aside the jury verdict is unpersuasive for three reasons. First, the jury verdict is consistent. Question 3 of the verdict form is a non-binding advisory verdict, to assist in the Court in the calculation of any damages. The Court "include[d] the plaintiff's proposed question on the verdict form as to the timing of any alleged discrimination because [the Court] would like the jury's views when and if [the Court is] called on to decide back pay." The Court also informed the jury that the issue of back pay will be determined by the Court, not the jury, based on its answers to the verdict form. Because the answer to Question 3 is non-binding, there is no inconsistency in the jury verdict.

Second, the jury is entitled to "an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law." *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1045–46 (S.D.N.Y. 1986); *accord In re Vivendi Universal, S.A. Sec. Litig.*, 765 Supp. 2d 512, 554 n. 33 (S.D.N.Y. 2011). The jury's finding may be interpreted to mean that Plaintiff had no realistic chance of being hired as CRMS since the DFS's inception. The evidence at trial was sufficient to support this view: October 2011 coincides with the date of DFS's creation; based on Ms. Atabaki and Plaintiff's testimony, DFS, since its inception, had a strong focus in enforcing U.S. sanctions against Iran; Ms. Atabaki testified that since October 2011, she was demoted from being the head of her division.

Third, the jury had clear guidance on the verdict form (which is in the record as a court exhibit) that the discrimination claim was based on the failure to promote him to CRMS. The first heading on the verdict form is "Mr. Saber's Discrimination Claim." Beneath the heading is Question 1, which asks, "Has Mr. Saber proven by a preponderance of the evidence that his national origin was a motivating factor in DFS' decision not to select him for the Chief Risk Management Specialist position?" The jury answered "Yes." Question 2 asks the same question, substituting "religion" for ""national origin." The jury answered "No." Question 3, the question at issue, asked: "If you answered yes to either Question 1 or 2 above, set forth the date (month and year) of DFS's first decision not to select him for the Chief Risk Management Specialist position that was taken because of Mr. Saber's national origin and/or religion[.]" The jury answered October 2011.

The jury's identification of October 2011 as the date when DFS first decided not to select Plaintiff as CRMS reflects the jury's selecting the earliest possible date to commence back pay damages. Consistent with the spirit of the jury's advisory verdict in Question 3, that date is July

2012, when DFS circulated an internal memorandum reflecting its decision not to hire Plaintiff as CFS after interviewing him.

### b. Insufficiency of Evidence

Defendant also argues that the jury verdict should be set aside because the only evidence supporting a finding of discriminatory intent in not promoting Plaintiff to the CRMS position is Logan's single comment -- that Plaintiff was hiding yellow cake in his cubicle. Defendant overlooks substantial circumstantial evidence of discrimination including the following: despite being inexperienced and not having been recommended for hiring, Cappello was hired for the CRMS position instead of Plaintiff, who was highly educated, knowledgeable and experienced in the work for DFS; Plaintiff was later made to educate Cappello, who had no prior experience in the field and had technical deficiencies; when the CRMS position reopened, Bumgardner was hired for the CRMS position, despite her having been ranked last for hiring after the January 2014, interview; neither Cappello nor Bumgardner was Iranian or Muslim; ever since the October 2011 merger, DFS has targeted banks to enforce the U.S. sanctions against Iran; around the same time, the only other Iranian Muslim at DFS besides Plaintiff, who was also highly qualified and educated, was demoted from a senior position. This is not an instance where "there is such a complete absence of evidence supporting the verdict" as to justify overturning a jury verdict. *Niagara Mohawk Power Corp.*, 252 F.3d at 597.

### 3. Retaliation Claim

DFS argues that the jury verdict should be set aside because there was insufficient evidence of two elements of a retaliation claim: (1) an adverse employment action; (2) a "but-for" causal connection between at least one adverse action and the protected activity -- Plaintiff's EEOC complaint. These arguments fail.

### a. Adverse Employment Action

DFS argues that none of the following amounted to an adverse action to support a retaliation claim: (1) the January 10, 2014, performance evaluation, (2) the January 14, 2014, interim evaluation report, (3) the May 2014 unsatisfactory mid-year rating, (4) the October 2014 Notice of Discipline with a proposed 20-day suspension without pay and (5) the allegedly lesser work assignments. Even though the jury did not specify which of DFS's actions constituted an adverse action in retaliation for Saber's EEOC complaint, the evidence was sufficient to support a finding of at least one adverse action.

"An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted); *accord Richardson v. Williams*, No. 15 Civ. 4117, 2017 WL 4286650, at *4 (S.D.N.Y. Sept. 26, 2017).

A reasonable jury could find that the January 10, 2014, performance evaluation, the January 14, 2014, interim evaluation report, the May 2014, unsatisfactory mid-year rating, and the October 2014, Notice of Discipline with a proposed 20-day suspension without pay would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353. Also "[c]ourts have found that . . . significantly

14

diminished job responsibilities could reasonably dissuade an employee from engaging in protected activity." *Aponte v. Modern Furniture Mfg. Co., L.L.C.*, No. 14 Civ. 4183, 2016 WL 5372799, at *15 (E.D.N.Y. Sept. 26, 2016); *see, e.g.*, *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., L.L.C.*, 470 F. Supp. 2d 345, 356 (S.D.N.Y. 2007) (finding that a plaintiff who proffered evidence that "although she did receive substantive work assignments, many of the tasks assigned to her were inappropriately administrative or secretarial, and similarly situated male workers' assignments were not so dominated by such work," had established a showing of adverse employment action).

Defendant argues that Plaintiff failed to show by a preponderance of evidence that Defendant engaged in an adverse employment action because Plaintiff received an overall "satisfactory" rating in his January 10, 2014, performance evaluation, and that Plaintiff was not deterred from ultimately filing an EEOC complaint. This argument is rejected. First, even though Plaintiff's January 10, 2014, performance evaluation rated his performance as "satisfactory," the narrative was negative. This evaluation was followed by an interim evaluation, on January 14, 2014, which also contained negative comments. Ultimately, in May 2014, Plaintiff received an "unsatisfactory" rating for his performance, and in October 2014 Plaintiff received a Notice of Discipline, with a proposed 20-day suspension without pay. Any one or a combination of two or more of these actions could reasonably deter a similarly situated employee from engaging in protected activity. *See, e.g.*, *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 389 (S.D.N.Y. 2011) (finding that a reasonable jury could find that counseling memoranda, negative performance evaluation and notice of discipline in combination constitute adverse action for purposes of retaliation); *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("[I]n determining whether conduct amounts to an adverse employment action, the alleged acts

of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.").

Second, that Plaintiff amended his EEOC complaint in June 2014, even after the allegedly adverse employment actions, does not undermine a finding that Defendant engaged in materially adverse employment action. Though "it is relevant that [Plaintiff] himself was not deterred from complaining and pursuing his accommodation claim," *Quadir v. New York State Dep't of Labor*, No. 13 Civ. 3327, 2016 WL 3633406, at *7 (S.D.N.Y. Jun. 29, 2016), *aff'd*, 691 F. App'x 674 (2d Cir. 2017), it is not dispositive. *See Levitant v. City of New York Resources Admin.*, 558 F. App'x 26, 29 n. 2 (2d Cir. 2014) (recognizing that the plaintiff's pursuit of protected activity is relevant but not dispositive). In *Quadir*, on which Defendant relies, the court concluded that Plaintiff "has not presented enough evidence sufficient for a trier of fact to conclude that he suffered an adverse employment action" because "[t]he complained-of counseling memos, for example, . . . are concededly not disciplinary in nature and would not have deterred a reasonable employee from engaging in protected activity." *Id.* In contrast, here, Plaintiff received not only several negative performance evaluations, on October 2014, Plaintiff received a Notice of Discipline, which proposed a 20-day suspension without pay. These were sufficient for the jury to find, as it did, that Defendant had engaged in an adverse employment action.

### b. Causation

There was sufficient evidence at trial to support a finding of but-for causation, -- i.e., sufficient evidence for a finding that at least one adverse action would not have occurred if Plaintiff had not filed his November 2013 EEOC complaint. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . ." *Ya-Chen Chen v. City*

*Univ. of N.Y.*, 805 F.3d 59, 78 (2d Cir. 2015) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "'[B]ut-for causation does not [, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846.

On January 10 and 14, 2014, Plaintiff received evaluations that included negative comments. These were his first evaluations since 2006, and first ever evaluations with negative narrative. In May 2014, Plaintiff received an unsatisfactory mid-year rating. These negative evaluations commenced approximately six weeks after Plaintiff filed the EEOC complaint, and followed each other in quick succession across four months, each evaluation reflecting worse comments than the one before. *See Zann Kwan*, 737 F.3d at 845 (finding that temporal proximity between the protected activity and the employer's action may support a finding of an adverse action in a retaliation claim depending on the context of particular cases) (collecting cases).

The October 3, 2014, Notice of Discipline, also took place within a year of Plaintiff's EEOC complaint, and an arbitration hearing ensued in April and May 2015. At this arbitration hearing, Gollop questioned Plaintiff and later commented, in reference to the interrogation, "I didn't waterboard you, did I?"

Though Myra Francis, Cappello and Taam, who drafted the negative performance reviews denied being aware of the EEOC complaint at the time, the evidence at trial supports an

inference that at least Cappello was aware of the EEOC complaint when issuing the notice of discipline. For example, the Human Resources Department received notice of the EEOC complaint in December 2013, and the jury could have found that Gollop, as the head of labor relations, had access to this information and shared it with Cappello prior to the notice of discipline. To prevail on the retaliation claim, Plaintiff need not demonstrate that all five adverse actions took place with Defendant's knowledge of the EEOC complaint; only that any one of them did. In any event, the jury was entitled to credit the evidence that certain employees knew of the EEOC complaint when they engaged in adverse actions, and to discredit the denial of knowledge of the EEOC complaint. *United States v. McCarthy*, 271 F.3d 387, 399 (2d Cir. 2001) ("the jury [i]s entitled to weigh the evidence and decide the credibility issue for itself."), *abrogated on other grounds by Eberhart v. United States*, 546 U.S. 12, 126 (2005); *see also O'Hare*, 770 F.3d at 233 (finding that in reviewing a Rule 50 motion, the court "may not make credibility determination or weigh the evidence."). Accordingly, DFS failed to show that "there is such a complete absence of evidence supporting the verdict that the jury's finding" or "such an overwhelming amount of evidence in favor of the movant" as to warrant setting aside the jury verdict. *Niagara Mohawk Power Corp.*, 252 F.3d at 597.

Defendant argues that the evidence at trial cannot support but-for causation because all of the adverse actions began prior to the EEOC complaint. This argument is unpersuasive. As already discussed, Plaintiff's evaluations in January 2014, commenced within six weeks of Plaintiff's EEOC complaint, and were the first negative evaluations in eight years. *See Zann Kwan*, 73 F.3d at 845–46.

Defendant argues that a new supervisor is entitled to appraise an employee's work according to his or her own expectations, even if they are contrary to prior expectations.

Although that is Defendant's interpretation of the evidence, the jury is entitled to draw its own conclusion as between the parties' competing interpretations. *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions"). In this instance, the jury inferred that Defendant's decision to issue an evaluation for the first time in eight years was a result of the EEOC complaint, not a management change. *See U.S. Football League*, 644 F. Supp. at 1045–46 (finding that the jury is entitled to "an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law.").

Defendant's reliance on *Jones v. Assoc. Univs., Inc.*, 870 F. Supp. 1180, (E.D.N.Y. 1994), aff'd 71 F.3d 406 (2d Cir. 1995), is inapposite. In that case, the court found that the jury "reached a verdict founded upon confusion, speculation, sympathy and prejudice," because the plaintiff "ha[d] failed to present any evidence to suggest a causal link between his contraction of Lyme disease, and his employer's decision to fire him." *Id.* at 1196–97. For example, immediately prior to being terminated, plaintiff had been caught fabricating the ammunition log and repeatedly lying about it to his supervisors. *Id.* at 1188–89. In contrast here, as explained above, the evidence was sufficient to support a causal link between the EEOC complaint and the subsequent negative reviews and notice of discipline.

### c. Jury Confusion

Defendant also argues that the finding of causation must have been the product of the jury erroneously viewing Plaintiff's June 2013 out-of-title grievance, instead of the EEOC complaint, as protected activity. As discussed above, the jury's answer to Question 3 is non-binding, the jury is entitled to an idiosyncratic position, and there is ample evidence connecting the adverse employment actions to the EEOC complaint. As with the discrimination claim, the

jury was clearly instructed for the retaliation claim that the EEOC complaint was the protected activity for which they had to find but-for causation. The verdict form in Question 4 asked whether Plaintiff had proven that "one or more of the following was a material adverse employment action against him" and then enumerated the alleged adverse actions. The jury answered "Yes." The next question asked if Plaintiff had "proven . . . that the material adverse employment action would not have occurred if he had not filed a discrimination complaint against DFS with the [EEOC]." The jury answered "Yes." The district court may set aside the verdict only where there is "an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *See Niagara Mohawk Power Corp.*, 252 F.3d at 597. This is not such a case.

### 4. Alleged Evidentiary Errors

Defendant also argues that the jury verdict should be set aside because inadmissible evidence was introduced during the trial. This argument is unpersuasive.

Defendant argues that the following evidence was erroneously admitted: (1) evidence of Plaintiff's out-of-title grievance; (2) Scott Gollop's "waterboarding" comment; (3) testimony from Manzar Sahebjam-Atabaki; (4) evidence regarding hiring of John Cappello and Olivia Bumgardner; and (5) Sarina Saber's testimony.

### a. Evidence of Out-of-Title Grievance

Defendant's argument that the out-of-title grievance evidence was not relevant under Federal Rule of Evidence 401 is rejected. Plaintiff's out-of-title grievance was filed on June 11, 2013, essentially alleging that he was underpaid for the duties he performed. Approximately four weeks later, Plaintiff received formal counseling about his work product and attitude. Defendant sought to portray its counseling as a part of a series of progressive disciplinary steps it

took to address concerns about Plaintiff's work. Plaintiff sought to rebut this narrative by portraying the counseling as Defendant's discriminatory reaction to Plaintiff's filing the grievance. In this context, the grievance is relevant and important background. That the Court excluded the grievance as an independent basis for Plaintiff's discrimination claim does not mean that it is not probative or relevant to the parties' course of dealing. It would not be helpful to the jury's understanding of the course of events, or fair to Plaintiff, to admit evidence of the counseling (which both parties sought to admit), and not the grievance. *See, e.g.*, *Adlah v. Emergency Ambulance Servs.*, No. 17 Civ. 4688, 2018 WL 3093972, at *6 (E.D.N.Y. Jun. 22, 2018) ("The Court further notes that, even if plaintiff's other allegations of discrimination do not independently constitute adverse employment actions, they may provide relevant background evidence . . . ."); *Vernon v. Port Authority of N.Y. and N.J.*, 200 F. Supp. 2d 401, 403 (S.D.N.Y. 2002) ("[T]he Supreme Court has established that a discriminatory act which is not made the basis of a timely charge, may nonetheless 'constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.'") (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 533, 558 (1977)).

### b. "Waterboarding" Comment

Defendant argues that Gollop's "waterboarding" comment should have been excluded under Rule 403, because it was unfairly prejudicial. This argument is rejected. This evidence is highly probative in showing DFS's discriminatory intent. As the head of labor relations at DFS, Gollop was consulted prior to issuing the notice of discipline and questioned Plaintiff during the arbitration proceeding. DFS fails to articulate how this evidence could move the jury in a way that is unfair or inappropriate, such that "its probative value is substantially outweighed by the danger of . . . unfair prejudice." Fed. R. Evid. 403.

### c. Ms. Atabaki's Testimony

Defendant argues that Ms. Atabaki's testimony should have been excluded under Rule 403, because it was unduly prejudicial. There is no per se rule of admissibility or inadmissibility of "testimony by nonparties alleging discrimination at the hands of persons who played no role in the adverse employment decision challenged by the plaintiff." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 383 (2008). Such a question of admissibility "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* at 388. Here, Ms. Atabaki's testimony had significant probative value; Ms. Atabaki and Plaintiff were the only Muslim and Iranian employees of DFS at the time. Both occupied professional positions. Both were highly educated and experienced. Both started their careers at DFS's predecessor organization. And both made similar allegations of discrimination during the same period when the organization was targeting financial institutions that were suspected of violating the Iranian sanctions.

To limit the likelihood of confusion, a limiting instruction was given, both when she testified and in the jury's final instructions:

> "As I told you before, she is not a party to this lawsuit, so you will not be determining whether she is entitled to relief from DFS for allegedly discriminating or retaliating against her. It will be for you to decide, what weight, if any, to give Ms. Atabaki's testimony in determining the issues before you involving Mr. Saber, namely, whether DFS discriminated or retaliated against Mr. Saber."

There is no evidence that the jury did not understand or failed to abide by this limiting instruction. *See United States v. Monsalvatge*, 850 F.3d 483, 496 (2d Cir. 2017) ("[A]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

Defendant mischaracterizes Ms. Atabaki's testimony as being primarily based on Mr. Saber's testimony.  Ms. Atabaki's testimony provided her own experience of the alleged discrimination and retaliation by DFS, and the culture of DFS after the merger.  No part of her testimony was "circular."

Defendant's reliance on Federal Rule of Evidence 404(b) is also misguided.  Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  Ms. Atabaki's testimony was not admitted to show the "character" of DFS or its propensity to discriminate.  Instead, Ms. Atabaki's testimony provided context as she offered her own observation of DFS's emphasis on enforcement of the sanctions against Iran, and her perception of DFS's discriminatory attitude toward Iranians at the time.  *See United States of America v. Yonell Allums*, 15 Cr. 153, 2018 WL 2128372, at *4 (S.D.N.Y. May 9, 2018) ("To the extent other act evidence is not direct evidence of the charged crimes, it remains admissible under Rule 404(b) if '(1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction.'") (quoting *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003)).[2]

### d. Evidence regarding hiring of John Cappello and Olivia Bumgardner

Defendant argues that evidence related to Cappello and Bumgardner's hiring was irrelevant and unduly prejudicial and should have been excluded under Rule 401 and 403.  This argument is unpersuasive.  This evidence was highly relevant to Defendant's discriminatory

---

[2] In addition, Defendant did not object to testimony concerning Cappello's selection, therefore waiving the objection.

intent given the difference in qualifications between Plaintiff, on the one hand, and these two employees who were hired in his place on the other hand. Defendant fails to articulate how this evidence's "probative value is substantially outweighed by a danger . . . of unfair prejudice." Fed. R. Evid. 403.

### e. Sarina Saber's testimony

Defendant argues that Mrs. Saber's testimony should have been excluded because it is hearsay and is overly prejudicial. Mrs. Saber's testimony that Plaintiff was "was really upset that somebody in the office saying something that he was hiding the yellowcake under his desk" is not hearsay, because her testimony was not offered for the truth of the statement that Plaintiff was told that he was hiding yellowcake. Plaintiff himself offered that evidence. Instead, Mrs. Saber's testimony was offered to provide context to her observation that Plaintiff was very upset by the comment. She proceeded to testify that Plaintiff "was upset and shocked about [the yellowcake comment], and also very embarrassed . . . by people saying something to him in front of others. It's insulting."

### B. Remittitur of Jury Damages

Defendant has moved in the alternative to the motion for judgment as a matter of law for a new trial and/or remittitur. Defendant requests that the jury award for emotional distress be reduced from $2.5 million to an amount between $5,000 and $35,000. "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (internal quotation marks omitted). Under Title VII, the amount of compensatory damages for emotional distress is capped at $300,000. 42 U.S.C. § 1981a(b)(3)(D). Considering the evidence

at trial and similar cases as explained below, the jury's award of $2.5 million is remitted to $125,000.

At the trial, Plaintiff testified that he felt "extremely uncomfortable . . . because people turn and stare at you" in response to Logan's "yellow cake" comment and that he felt "very, very much offended," "very angry," and "also upset and concerned" in response to Gollop's "waterboarding" comment. Plaintiff described feeling "that I am always the target . . . And when you go to work, you absolutely do not know what can set off something very negative and uncomfortable," leaving him feeling "very insecure about the future and very isolated, and looking over the shoulder constantly." He also testified that he was sleeping less and at times felt humiliated and embarrassed. Plaintiff's wife similarly testified that Plaintiff "has become more reserved and . . . doesn't like to engage with people that much, and kind of upset" and that Plaintiff "cannot sleep good and cannot sleep long," "is very distracted" and that he listens to music a lot "to get peace with music, like holding himself." Plaintiff has not sought treatment for any physical or mental conditions associated with the injuries he alleges were attributable to the actions of DFS that form the basis of this lawsuit.

Emotional distress damages are available even where the plaintiff has not sought medical treatment or the distress does not manifest in physical symptoms. *Patrolmen's Benevolent Ass'n. of City of N.Y. v. City of New York*, 310 F.3d 43, 55-56 (2d Cir. 2002); *accord Sachs v. Nunziante*, No. 15 Civ. 1825, 2016 WL 4506731, at *4 (E.D.N.Y. Jul. 21, 2016). In evaluating requests for remittitur, "courts have reviewed awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Ragusa v. City of New York*, 222 F. Supp. 3d 297, 300 (S.D.N.Y. 2016) (citing *Scala v. Moore-McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993)). "Emotional distress awards within

the Second Circuit can generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Garden-variety emotional distress claims are those where "the evidence usually is limited to the testimony of the plaintiff, who describes the emotional distress in vague or conclusory terms, presents minimal or no evidence of medical treatment, and offers little detail of the duration, severity, or consequences of the condition." *Reiter*, 2003 WL 22271223, at *9; *accord Legg*, 2017 WL 3668777, at *12.

As Plaintiff did not seek medical attention for his emotional distress, it is considered to be "garden variety." The upper limit for damages compensating garden variety emotional distress caused by employment discrimination and retaliation appears to be around $125,000. *See Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.") (internal quotation marks omitted); *Rosas v. Balter Sales Co. Inc.*, No. 12 Civ. 6557, 2018 WL 3199253, at *9 (S.D.N.Y. Jun. 29, 2018) (collecting cases).

"[A] district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive," *Abel v. Town Sports Intern., L.L.C.*, No. 09 Civ. 10388, 2012 WL 6720919, at *15 (S.D.N.Y. Dec. 18, 2012) (quoting *Bouchard Transp. Co.*, 917 F.2d at 1330). The jury fully credited Plaintiff's and his wife's testimony describing Plaintiff's emotional distress and viewed it as serious, as evidenced by the $2.5 million award. Giving deference to the jury's finding and yet honoring the principle that emotional distress damages are

required to be compensatory (rather than punitive or exemplary) and in light of the awards in similar cases, the jury award here is reduced from $2.5 million to $125,000.

Plaintiff's reliance on *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007), to support a jury award beyond $125,000, is inapposite. In *Osrio*, which involved ongoing sexual harassment, in supporting the jury award of $4 million in compensatory damages for emotional distress for the retaliation claim, the court noted that "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of other in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like." *Id.* at *5. In contrast here, Plaintiff presented no evidence of a hostile work environment that rose to the same level as in *Osrio*. In addition, Plaintiff testified only to feeling "very uncomfortable" and "very angry" in response to two discrete comments.

Plaintiff's reliance on *Phillips v. Bowen,* 278 F.3d 103 (2d Cir. 2002), is also inapposite. In that case, in affirming the jury award for emotional distress of $400,000, the court noted that "Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. [Plaintiff] and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. [Plaintiff's] co-workers testified about the deterioration they observed in [Plaintiff]. Other less direct indicia of plaintiff's damages came from the defendants themselves, who unapologetically described their treatment of plaintiff." *Id.* at 111–12. In contrast, here, the only evidence supporting Plaintiff's emotional distress is his own testimony and that of his wife. The testimony of both witnesses was general -- that Plaintiff was "embarrassed," "humiliated," "very uncomfortable." None of

Plaintiff's coworkers took the stand to testify as to Plaintiff's alleged change in behavior or deterioration in lifestyle. After considering Plaintiff's case and the statutory cap of $300,000, the Court finds that the maximum amount that Plaintiff could recover is $125,000. If Plaintiff does not accept the damages award in the remitted amount, the Court will vacate the award and conduct a new trial limited to the question of damages.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment as a matter of law is DENIED. Defendant's motion for a new trial is GRANTED unless Plaintiff accepts the damage award in the remitted amount. Plaintiff has 14 days from the date of the filing of this Opinion and Order to make an election. The verdict returned by the jury otherwise stands.

The Clerk of Court is respectfully directed to close Docket Number 160.

Dated: July 20, 2018
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE